**STATE OF MICHIGAN and all Related Cases Pending in the District of Minnesota, Fourth Division, Plaintiffs,**

v.

**MORTON SALT COMPANY et al., Defendants.**

Nos. 4–64–Civ. 423, 4–64–Civ. 422, 4–65–Civ. 1, 4–65–Civ. 197, 4–65–Civ. 388, 4–65–Civ. 398 to 4–65–Civ. 400, 4–65–Civ. 402, 4–66–Civ. 17, 4–66–Civ. 69, and 4–66–Civ. 138.

United States District Court
D. Minnesota,
Fourth Division.

July 28, 1966.

Supplemental Opinion Aug. 11, 1966.

Frank J. Kelly, Atty. Gen., Maxine Boord Virtue, Asst. Atty. Gen., Lansing, Mich., Robert A. Albrecht and Faricy, Moore, Costello & Hart, St. Paul, Minn., for plaintiff State of Michigan (Stanton S. Faville, Chief Asst. Atty. Gen., Maurice M. Moule, David P. Van Nolte, and Francis J. Carrier, Asst. Attys. Gen., on the briefs).

Robert W. Mattson, Atty. Gen., and Kenneth J. Fitzpatrick, Sp. Asst. Atty. Gen., St. Paul, Minn., for plaintiffs in State of Minnesota case (Raymond M. Lazar, Sp. Asst. Atty. Gen., St. Paul, Minn., on the brief).

Bronson C. La Follette, Atty. Gen., George F. Sieker, Asst. Atty. Gen., and James D. Jeffries, Asst. Atty. Gen., Madison, Wis., for plaintiffs in State of Wisconsin case.

Lawrence F. Scalise, Atty. Gen., Des Moines, Iowa, William E. Mullin and

Mullin, Galinson & Swirnoff, Minneapolis, Minn., for plaintiffs in State of Iowa case (Nolden Gentry, Asst. Atty. Gen., Verne C. Lawyer, Sp. Asst. Atty. Gen., Des Moines, Iowa, and Raymond T. Walton, Sp. Asst. Atty. Gen., Iowa State Highway Comm'n, Ames, Iowa, on the brief; Douglas E. Miller, Asst. Atty. Gen., Iowa State Highway Comm'n, Ames, Iowa, of counsel).

Charles S. Rhyne, Brice W. Rhyne, Anthony L. Joseph and Rhyne & Rhyne, Washington, D. C., for plaintiff City of Milwaukee (John J. Fleming, City Atty., Milwaukee and Ray T. McCann, Milwaukee, Wis., on the brief; Maslon, Kaplan, Edelman, Joseph & Borman, Minneapolis, Minn., of counsel).

Robert L. Hyder, Chief Counsel, and Robert R. Northcutt, Asst. Counsel, Missouri State Highway Comm'n, Jefferson City, Mo., for plaintiff Missouri State Highway Comm'n.

William G. Clark, Atty. Gen., Lee A. Freeman, John Borst, Jr., Sp. Asst. Attys. Gen., and McConnell, Freeman, Curtis & McConnell, Chicago, Ill., for plaintiff State of Illinois.

Lee A. Freeman, John Borst, Jr., and McConnell, Freeman, Curtis & McConnell, Chicago, Ill., for plaintiff Chicago Transit Authority.

John J. Dillon, Atty. Gen., Indianapolis, Ind., Lee A. Freeman, John Borst, Jr., and McConnell, Freeman, Curtis & McConnell, Chicago, Ill., William M. Osborn and Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., for plaintiff State of Indiana.

Philip E. Byron, Jr., General Counsel, Indiana Toll Road Comm'n, Elkhart, Ind., and Lee A. Freeman, John Borst, Jr., and McConnell, Freeman, Curtis & McConnell, Chicago, Ill., for plaintiff Indiana Toll Road Commission.

Lee A. Freeman, John Borst, Jr., and McConnell, Freeman, Curtis & McConnell, Chicago, Ill., William M. Osborn, Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., for plaintiffs in Indianapolis case.

Daniel P. Ward, Cook County State's Atty., Edward J. Hladis, Chief of Civil Division, Ronald W. Olson and Bergstrom, Brizius & Olson, Chicago, Ill., for plaintiff Cook County (Ronald Butler and Thomas A. Hett, Asst. State's Attys., Chicago, Ill., of counsel).

John M. Palmer and Levitt, Palmer, Bowen & Bearmon, Minneapolis, Minn., Colvin A. Peterson, Jr., and Watson, Ess, Marshall & Enggas, Kansas City, Mo., for defendant American Salt Co.

Benedict S. Deinard, Allen I. Saeks and Leonard, Street & Deinard, Minneapolis, Minn., Frank S. Hodge and Hodge, Jones & Reynolds, Hutchinson, Kan., for defendant Barton Salt Co.

Benedict S. Deinard, Allen I. Saeks and Leonard, Street & Deinard, Minneapolis, Minn., F. William McCalpin and Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for defendant Hardy Salt Co.

Erwin C. Heininger, Thomas B. McNeill, John E. Allen and Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., Peter Dorsey, Craig Beck and Dorsey, Owen, Marquart, Windhorst & West, Minneapolis, Minn., for defendants Cargill, Inc., and Cargo Carriers.

James P. Brody and Foley, Sammond & Lardner, Milwaukee, Wis., Ralph H. Neimeyer and Reavill, Neimeyer, Johnson & Killen, Duluth, Minn., for defendant Cutler-Magner Co.

William B. Swearer and Martindell, Carey, Hunter & Dunn, Hutchinson, Kan., Norman R. Carpenter and Faegre & Benson, Minneapolis, Minn., for defendant Carey Salt Co.

Fred W. Freeman and Dickinson, Wright, McKean & Cudlip, Detroit, Mich., Robert E. Bowen and Bowen, Preus, Farrell & Adams, Minneapolis, Minn., for defendant Diamond Crystal Salt Co.

John P. Ryan, Jr., and McBride, Baker, Wienke & Schlosser, Chicago, Ill., Robert B. Hawkins and Oppenheimer, Hodgson, Brown, Wolff & Leach, St. Paul, Minn., for defendant Morton Salt Co.

Richard W. Johnson, Lloyd Graven and Neville, Johnson & Thompson, Minneapolis, Minn., Howard F. Ordman and Putney, Twombly, Hall & Skidmore, New York City, Richard K. Decker and Lord, Bissell & Brook, Chicago, Ill., for defendant International Salt Co.

## MEMORANDUM DECISION

### (§ 5 [b], Clayton Act)

LARSON, District Judge.

In these consolidated treble damage antitrust actions this Court's Pretrial Order of November 23, 1965, directed the parties to brief and argue several questions concerning the application of § 5(b) of the Clayton Act. Plaintiffs herein include the States of Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri and Wisconsin and various governmental units within these States, and in the Milwaukee class action governmental units from other States. Defendants are companies engaged in some aspect of the salt industry. They are American, Barton, Carey, Cargill, Cargo Carriers, Cutler-Magner, Diamond Crystal, Hardy, International and Morton.[1] These actions stem from criminal and civil antitrust proceedings by the United States against Carey, Diamond, International, and Morton Salt Companies. The Government action was based on an alleged conspiracy among the four named defendants, with other alleged coconspirators, to fix prices of rock salt sold to various State and local governmental entities for de-icing purposes.

Under § 5(b) of the Clayton Act, a government antitrust proceeding serves to toll the statute of limitations on private treble damage suits.[1a] As originally enacted in 1914, § 5(b) was part of a broader § 5 which included the present § 5(a). The latter allows a final judgment or decree against a defendant in a Government proceeding to be used as prima facie evidence in a private treble damage suit.[2] Before the 1955 amend-

---

**1.** These cases have been consolidated pursuant to a national program for the handling of private treble damage suits arising out of the Government litigation involving the salt industry. Cf. Neal & Goldberg, The Electrical Equipment Antitrust Cases: Novel Judicial Administration, 50 A.B.A.J. 621 (1964). In the present cases, all defendants are not named in every complaint, but in general the parties on either side are united in approach and will be referred to as a group, unless otherwise indicated. While some of these actions have been partially or completely settled, the issues determined herein still are relevant for some of the parties.

**1a.** The Clayton Act provides in § 5(b):
"Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."
Section 5(b), 38 Stat. 731, as amended, 15 U.S.C. § 16(b) (1964 ed.)

**2.** The Clayton Act provides in § 5(a):
"A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title."
Section 5(a), 38 Stat. 731, as amended, 15 U.S.C. § 16(b) (1964 ed.).

ments which segregated the prima facie provision from the tolling provision into subheadings (a) and (b), there was no Federal statute of limitations applicable to private antitrust actions. Congress, in 1955, amended the Clayton Act to provide, in § 4B, a four year limitations period.[3] In addition, the tolling section was amended to extend the period of suspension for one year following the conclusion of the Government lawsuit. A further change in the tolling provision was the substitution of "civil or criminal proceeding" for the phrase "suit or proceeding in equity or criminal prosecution." Apart from these changes, the basic structure of § 5(b), and § 5(a), remained unaltered from the 1914 enactment. As the Supreme Court indicated in Minnesota Mining & Manufacturing Company v. New Jersey Wood Finishing Company, 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965) [hereinafter cited as *3M*], "* * * the record of the 1914 legislative proceedings reveals an almost complete absence of any discussion on the tolling problem." 381 U.S. at 321, 85 S.Ct. at 1478. However, the Court noted that one basic intent underlying the tolling provision is outstanding— "the clearly expressed desire that private parties be permitted the benefits of prior government actions." 381 U.S. at 320, 85 S.Ct. at 1478.

Many of the issues raised in the present proceeding are not readily resolved by the plain language of § 5(b), so this basic policy objective must be kept in mind in considering the following questions: (A) When did the Government proceeding commence; and (B) when did it terminate? (C) What defendants in the present actions are subject to the tolling of § 5(b); and (D) what plaintiffs are benefited by that provision? Finally, there is the question of (E)

whether the present actions are based in whole or in part on any matter complained of in the Government action.

(A) *Commencement of Government Action—*

Suspension of the period of limitations under § 5(b) is inaugurated "Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws * * *." In early 1959 the Justice Department initiated an investigation of the salt industry and a grand jury empaneled in Springfield, Illinois, in May of that year did consider antitrust violations, as well as other matters. Apparently no formal action was taken by this jury before it was discharged. Subsequently, in February, 1960, another grand jury was convened in Springfield to investigate the salt industry, but no indictments were returned. Thereafter, in September, 1960, a third grand jury was convened in St. Paul, Minnesota. As a result of its investigation, indictments were filed on June 28, 1961, charging Morton, Diamond, International, and Carey Salt Companies with violations of the antitrust laws.

In the *3M* case the Supreme Court was faced with the question of whether a proceeding by the Federal Trade Commission against a treble damage defendant served to toll the statute under § 5(b) to the same extent as judicial proceedings. Holding that the F. T. C. action did suspend the limitations period, the Court rejected defendant's argument that since the Commission's Order could have no prima facie effect under § 5(a), the tolling of § 5(b) was equally inapplicable. Assuming, without deciding, that § 5(a) also

**3.** 4B of the Clayton Act provides:
"Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section and sections 15a and 16 of this title shall be revived by said sections."
Section 4B, 69 Stat. 283, 15 U.S.C. § 15b (1964 ed.).

governs final Orders of the Commission,[4] the Court made it clear that the two sections are not so intertwined that the scope of § 5(b) is limited by § 5(a).

Seeking the earliest possible date for tolling purposes, plaintiffs herein argue that if a Federal Trade Commission administrative proceeding can activate the tolling provision, *a fortiori* a grand jury deliberation tolls the statute, since it is a judicial proceeding. Despite the fact that the grand jury is part of the judicial process, and that a grand jury inquiry is "instituted" by the United States through its attorneys, differences between a grand jury hearing and the Commission action involved in *3M* lead to the conclusion that the statute was not here tolled by the grand jury deliberations in Illinois or Minnesota.

The statutory language is important. Section 5(b) operates to suspend the statute of limitations when the United States institutes an action "to prevent, restrain, or punish violations of any of the antitrust laws * * *." The Commission proceeding against the *3M* defendant was instituted to prevent the creation of a monopoly and to restrain a threatened decrease in competition, due to an asset acquisition by Minnesota Mining, and resulted in a consent order pursuant to which defendant was required to divest itself of these assets. A grand jury proceeding, on the contrary, has no immediate or direct goal of punishment, prevention, or restraint. The Government's first step toward punishing violations of the antitrust laws may well be the institution of a grand jury hearing, as plaintiffs argue. However, this is an investigative phase, which could result in a determination that no punishment is needed. At oral argument, the Court suggested that the grand jury is more analogous to a Commission investigation which may precede the formal action of filing a complaint. Plaintiffs responded by analogizing the F. T. C. pre-complaint activity to an F. B. I. investigation preparatory to convening the grand jury. The grand jury must, nonetheless, be regarded as an investigative activity. Unlike the F. T. C. action with which *3M* was concerned, a grand jury hearing is not an adversary proceeding. In fact, it is conceivable that the potential defendant, as well as the prospective treble damage plaintiff, would have no knowledge that a grand jury had been convened.

Cases and statutes cited by plaintiffs to demonstrate that grand jury deliberations are "proceedings" are not relevant in the present context.[4a] The question presented here must be resolved in light of the particular legislative language and purpose. That a grand jury was held to be a "proceeding" within the scope of a statute granting immunity from prosecution based on testimony in any suit or proceeding, as in Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), does not answer the question of whether it is a proceeding to prevent, restrain, or punish within the meaning of § 5(b).

Apart from the fact that the grand jury does not prevent, restrain, or punish within the meaning of the statutory language, the matters complained of in the grand jury proceeding cannot be readily determined. As indicated by the Court in *3M*, the applicability of § 5(b) in a particular treble damage action depends upon an analysis of the matters complained of in the Government pro-

---

**4.** At least one Court has held that FTC final orders do have prima facie effect under § 5(a). See Carpenter v. Central Arkansas Milk Producers Ass'n, 34 U.S.L. Week 2677 (W.D.Ark., May 31, 1966). See also, Rockefeller, The Supreme Court and the Private Anti-Trust Plaintiff, 7 B.C.Com. & Ind.L.Rev. 279 (1966); Matteoni, An Antitrust Argument: Whether a Federal Trade Commission Order is Within the Ambit of the Clayton Act's Section 5, 40 Notre Dame Law. 148 (1965).

**4a.** Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960); Marcus v. United States, 310 F.2d 143 (3rd Cir. 1962); 5 U.S.C. § 310.

ceeding and the private action. This was accomplished in *3M* by comparing the allegations of the Commission's complaint with those of the treble damage plaintiff. Since no formal complaint is filed to institute a grand jury hearing, it would be difficult to determine what matters were complained of therein. This difficulty is recognized by plaintiffs to the extent that they relate the matters complained of in the Minnesota grand jury hearing to the indictment subsequently returned.

Another reason for holding that a grand jury proceeding is not within § 5(b) is that it fails to serve the purposes of that section. In *3M* the Supreme Court indicated that " * * * the potential advantages available to * * * [private] litigants because of § 5(b) reach far beyond the specific and limited benefits accruing to them under § 5(a)." 381 U.S. at 320, 85 S.Ct. at 1478.

> "The Government's initial action may aid the private litigant in a number of other ways [apart from the prima facie effect of the judgment or decree]. The pleadings, transcripts of testimony, exhibits and documents are available to him in most instances. In fact, the rules of the Commission so provide. * * * Moreover, difficult questions of law may be tested and definitively resolved before the private litigant enters the fray. The greater resources and expertise of the Commission and its staff render the private suitor a tremendous benefit aside from any value he may derive from a judgment or decree." (Citations omitted.) 381 U.S. at 319, 85 S.Ct. at 1477.

These benefits do not flow from a grand jury deliberation. Although there are occasions when a private litigant may secure information about a grand jury hearing,[5] in general the proceedings remain veiled in secrecy. Moreover, the possibility does not exist that difficult questions of law will be resolved by the grand jury. These considerations, together with the factors discussed above, lead to the conclusion that the statute of limitations was not tolled for the present cases by virtue of the grand jury proceedings either in Illinois or Minnesota.

█ Alternatively, plaintiffs suggest that the statute was tolled as of June 28, 1961, the date the indictment was filed. No defendant has objected to this suggestion. Accordingly, the date which will govern the commencement of the tolling under § 5(b) is June 28, 1961. This date is relevant for determining the first year for which plaintiffs may claim damages, if they can show an illegal conspiracy. Apart from § 5(b), the damage period may be further extended if plaintiffs can show fraudulent concealment of the alleged conspiracy. Therefore, the date of June 28, 1961 may subsequently be affected by resolution of the issue of fraudulent concealment.

B. *Termination of Government Action—*

Under § 5(b), the statute of limitations is tolled on every private right of action during the "pendency" of a Government proceeding, and for one year thereafter. To determine the timeliness of plaintiffs' respective actions, the termination date of the Government proceedings against some of the defendants herein must now be ascertained.

As indicated, the indictment charging Morton, Diamond, International, and Carey Salt Companies with conspiring to fix the price of rock salt was filed on June 28, 1961. Before the criminal trial commenced, Carey entered a plea of *nolo contendere* on March 26, 1962. Thereafter, the remaining three defendants proceeded to trial, which resulted in a verdict of not guilty rendered on June 7, 1962. Concurrent with the criminal action, a Government civil suit was also pending against these defendants. Although this action was commenced by a complaint filed on July 11, 1961, its prog-

---

5. See United States v. Proctor & Gamble Co., 356 U.S. 677, 7 S.Ct. 983, 2 L.Ed.2d 1077 (1958); United States v. Pennsalt Chemicals Corporations, 240 F.Supp. 837 (E.D.Pa.1966).

ress was stayed during the trial of the criminal case. After the verdict in that action, the civil suit was reactivated, resulting in a judgment against defendants Morton and Diamond, entered on November 24, 1964. Prior thereto, both International and Carey had entered into consent decrees, the latter on March 26, 1962; the former on November 4, 1963.[6] On February 19, 1965, the judgment against Morton and Diamond was amended, and was affirmed on appeal to the Supreme Court on October 26, 1965. Morton Salt Company v. United States, 382 U.S. 44, 86 S.Ct. 181, 15 L.Ed.2d 36 (1965).

Plaintiffs herein disagree with defendants as to when the foregoing actions ceased to pend for purposes of § 5(b). Defendants Carey and International both argue that § 5(b) requires a defendant-by-defendant analysis of the time when a Government suit ceases to pend. Under this approach, these defendants contend, the Government actions against them terminated with their respective consent decrees. Plaintiffs, on the other hand, urge that the proceedings must be considered as a unit, so that a Government action does not cease to pend against any one defendant until it is terminated with respect to all. Morton and Diamond share the view that the Government action terminated as to them with the verdict in the criminal case. They are opposed to plaintiffs' contention that the criminal and civil proceedings can be tacked together to toll the statute until the civil judgment was affirmed on appeal.

(1) *International and Carey*—In support of their position that the Government proceedings terminated with their consent decrees, International and Carey rely upon a line of cases decided after United States v. Paramount Pictures, Inc., 66 F.Supp. 323, 70 F.Supp. 53 (S.D. N.Y. 1946), aff'd in part, rev'd and remanded in part, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), 85 F.Supp. 881 (S.D.N.Y.1949), aff'd per curiam, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380 (1950), a Government antitrust action against several companies in the mo-

6. The International consent decree originated with a stipulation filed on September 30, 1963, which allowed the Government to withdraw its agreement at any time within 30 days thereafter. That consent was not withdrawn and on November 4, 1963, a decree was entered pursuant to the stipulation. Its effectiveness was stayed, however, for 30 days. Later, a stipulation and Order were filed stating that the decree was to be fully operative from January 5, 1964, except one paragraph, the effect of which was postponed until February 5, 1964. Counsel for International indicates that the two postponements were necessary to protect the company from being in contempt of the decree before its distribution system could be arranged to comply with the terms of that decree. The foregoing sequence of events has prompted disagreement between plaintiffs and International as to the effective date of the consent decree. International insists that it was binding on them at least as early as October 31, 1963, the date on which the Government's right to withdraw expired. Alternatively, it is argued that the decree was final on November 4, 1963. Plaintiffs reject both of these dates and suggest that the subsequent Order postponed the effectiveness of the decree at least until January 5, 1964. In addition, plaintiffs take an alternate position that the consent decree and judgment of November 4, 1963, could have no finality because Rule 54(b), Fed.R.Civ.Proc., 28 U.S.C., requires an express determination by the Court that there is no just reason for delay in entry of judgment with respect to one party where multiple parties are involved. From this, plaintiffs contend that International's consent decree did not operate to conclude the action as to them so it continued to pend until a final judgment was entered which terminated the litigation as to all defendants. Plaintiffs take this same position with respect to Carey's consent decree. It is not necessary to consider the relationship of Rule 54(b) to the statute of limitations, since there are other grounds to support the conclusion that the action continued to pend until October 26, 1965, for International and Carey despite their consent decrees. For a discussion of Rule 54(b) in a related context see Comment, Pendency and the Tolling Provision of the Clayton Act, 9 Stanf.L.Rev. 552 (1957).

tion picture industry.[7] That action began in 1938 and was finally resolved in 1950, but in the interim consent decrees were entered against some of the defendants at various times.[8] As treble damage suits flourished following the Government action, the question of when the Government proceeding ceased to pend was a recurring problem.[9] Several courts resolved the question on a defendant-by-defendant basis. See Union Carbide & Carbon Corporation v. Nisley, 300 F.2d 561 (10th Cir. 1961), appeal dismissed sub nom Wade v. Union Carbide & Carbon Corp., 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1963); Sun Theatre Corporation v. RKO Radio Pictures, 213 F.2d 284 (7th Cir. 1954); Grengs v. Twentieth Century Fox Film Corporation, 232 F.2d 325 (7th Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 77 (1956); Skouras Theatres Corporation v. Radio-Keith Orpheum Corporation, 193 F.Supp. 401 (S.D.N.Y. 1961); Manny v. Warner Brothers Pictures, 116 F.Supp. 807 (S.D.Calif.1953); Electric Theatre Company v. Twentieth Century Fox Film Corporation, 113 F.Supp. 937 (W.D.Mo.1953); Tague v. Balaban, 146 F.Supp. 356 (N.D.Ill.1956). While all of these cases looked to the termina-

tion date for an individual defendant, the most explicit holding and reasoning is contained in the *Sun Theatre* decision. Starting from the premise that the tolling provision was designed to protect the prima facie provision, the Seventh Circuit held that a Government suit ceases to pend as to a particular defendant when the litigation is terminated as to him. The Court indicated that no purpose is served by continuing to toll the statute under § 5(b) once a final judgment or decree is entered with respect to any one defendant, which plaintiff may thereafter use as prima facie evidence pursuant to § 5(a). The current validity of *Sun Theatre*, its predecessors and its progeny, is challenged by plaintiffs primarily on the basis of *3M* and Leh v. General Petroleum Corporation, 382 U.S. 54, 86 S.Ct. 203, 15 L.Ed.2d 134 (1965), [hereinafter cited as *Leh*]. Their contention is that these cases destroy the rationale of *Sun Theatre* and similar holdings, based as they are on the view that §§ 5(a) and 5(b) are coextensive.

In holding that an F.T.C. proceeding tolls the statute under § 5(b), the Court in *3M* noted distinctions between the express language of §§ 5(a) and 5(b),

7. The history and background of that litigation is contained in Conant, Antitrust in the Motion Picture Litigation (1960).

8. "In United States v. Paramount Pictures, Inc., for example the action was filed in 1938 and a consent decree entered against some of the defendants in 1940. Four years later, in August, 1944, the Government moved to modify the decree, seeking divorcement and divestiture, and the case was brought on for trial. After trial, appeal to the Supreme Court and remand, consent decrees were entered against one defendant in 1948, one in 1949, and against the remaining defendants in 1950. * * *"
Report of the Attorney General's National Committee to Study the Antitrust Laws, 382–383 (1955).

9. The 1940 consent decree entered in the *Paramount* case was later reopened and the courts also had to determine whether this decree terminated the action. Holding that the Government proceedings were not terminated thereby, Christensen v.

Paramount Pictures Inc., 95 F.Supp. 446 (D.Utah 1950), characterized the decree as a "stop gap" measure, or as a "trial" decree since it reserved to the United States the right to proceed and seek final relief at the end of the trial period. In accord: Twentieth Century Fox Film Corporation v. Brookside Theatre Corporation, 194 F.2d 846 (8th Cir.), cert. denied, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952); Leonia Amusement Corporation v. Loew's Inc., 117 F.Supp. 747 (S.D.N.Y.1953). A related problem occurred with respect to consent decrees which reserved to the Court continuing jurisdiction. In general, treble damage plaintiffs were unsuccessful in arguing that the retention of jurisdiction meant that the action continued to pend. See Sun Theatre Corp. v. RKO Radio Pictures, 213 F.2d 284 (7th Cir. 1956); Tague v. Balaban, 146 F.Supp. 356 (N.D. Ill.1956); Barnett v. Warner Bros. Pictures Distributing Corp., 112 F.Supp. 5 (N.D.Ill.1953).

as well as differences in the congressional policies underlying the two sections. These differences were reiterated in *Leh*, in which the issue was whether the plaintiff's treble damage suit was "based in whole or in part on any matter complained of" in a prior Government action, within the meaning of § 5(b). Refusing to accept the view that § 5(b) is circumscribed by collateral estoppel principles applicable to § 5(a), the Court in *Leh* adopted a broad construction of the tolling section and held that "[t]he private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants" as in the Government action in order to obtain the benefit of § 5(b). 382 U.S. at 59, 86 S.Ct. at 207. While neither *Leh* nor *3M* was directly concerned with the "pendency" language of § 5(b), this Court is of the opinion that they so weaken the foundation of the *Sun Theatre* line of cases that these decisions must be rejected as obsolete.

In *3M* the Supreme Court contradicted the opinion of the Seventh Circuit, expressed in *Sun Theatre,* that the tolling provision had no further purpose to serve once a judgment or decree is available which the private plaintiff may use as prima facie evidence. Thus, *3M* points out that the private litigant may receive invaluable aid from the pleadings, transcript, exhibits and documents in the Government suit, apart from the prima facie effect, if any, of these materials. Even though one defendant in the Government lawsuit may capitulate before his companions, it is quite reasonable to assume that as the proceedings continue, that defendant will be referred to in subsequent testimony, documents and exhibits. This will be particularly true where, as here, the Government's suit is based on an alleged conspiracy. Moreover, under

the *Sun Theatre* view, § 5(b) would have no useful function whatsoever where the private plaintiff is prohibited from using a consent decree as prima facie evidence under § 5(a) because it was entered before any testimony was taken. In addition, the important questions of law which the Supreme Court suggested might be resolved in the Government suit may not be raised or determined until after the action becomes inactive with respect to a particular defendant. If the private plaintiff must bring his lawsuit before the entire Government litigation has terminated, he may be without the guidance of a decision on a relevant matter.

■ Differences in the language of §§ 5(a) and 5(b) also lend some support to the conclusion that the Government proceedings continue to pend as to each defendant until the entire action is terminated. The former section states that a final judgment or decree in the Government action "to the effect that a defendant has violated" the antitrust laws "shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant * * *." In addition to the absence of a reference to final judgment or decree in § 5(b), as the Court observed in *3M*, that section does not provide for tolling the statute against "a defendant" or against "such defendant." Quoting from Union Carbide & Carbon Corporation v. Nisley, the Court in *3M* indicated:

" * * * The competency of a government judgment in a private suit is necessarily restricted to the requirements of due process. But the tolling of the statute during the pendency of the government litigation is not so limited." 381 U.S. at 318, 85 S.Ct. at 1477.[10]

10. Defendants suggest that since the Supreme Court cited and quoted with approval this language from the *Union Carbide* case, it also approved the holding in that case that tolling must be approached on a defendant-by-defendant basis. On the other hand, defendants

repeatedly point out that *3M* was not concerned with the questions presented here. Therefore, it cannot be assumed or implied that *3M* approved the result reached in *Union Carbide* respecting those issues pertinent here which were not raised in *3M*.

Under § 5(a), a due process question may be raised if the actions of one defendant are allowed to bind another. Therefore, that provision speaks in terms of estoppel. Estoppel is not an issue under § 5 (b), since Congress "was not then dealing with the delicate area in which a judgment secured in an action between two parties may be used by a third." 381 U.S. at 317, 85 S.Ct. at 1476. While it may be a hardship for one defendant to have the threat of treble damage suits lurking in the wings until the Government action plays itself out against all defendants, no due process issue is raised thereby. Granted that antitrust actions are notoriously protracted, and that the construction of § 5(b) adopted herein may result in a defendant being sued several years after the Government action has been completed for him, yet would this defendant have standing to complain if Congress had adopted, say, a ten year statute of limitations with no tolling provision? I think not.

The phraseology of § 5(a) is distinct from 5(b) in still another respect. In the former provision Congress extended an incentive to defendants to enter into consent decrees by exempting such decrees, when entered before any testimony is taken, from the prima facie effect of § 5(a). By contrast, § 5(b) is silent with respect to the effect of a consent decree on the statute of limitations. In amending the Clayton Act in 1955, Congress had before it the Report of the Attorney General's National Committee to Study the Antitrust Laws. Although several proposals of that Committee were adopted, Congress did not accept the Committee's recommendation that suspension of the period of limitations under § 5(b) terminate with respect to a consenting defendant at the time the decree is entered.[11] Plaintiffs argue that to accept the approach urged by International and

Carey would have the effect of inserting into § 5(b) the very recommendation which Congress bypassed. Defendants retaliate by arguing that since *Sun Theatre* and similar holdings were handed down prior to the 1955 amendments, and were not changed thereby, Congress impliedly approved the construction given to § 5(b) by these cases.

■ Neither argument is persuasive. The result reached herein finds its support not so much in canons of construction, or even explicit legislative history, but rather has its roots in the overall policy underlying § 5(b) and in the expansive interpretation placed on that section by the Supreme Court in *Leh* and *3M*. As the Court indicated in Burnett v. New York Central R. Co., 380 U.S. 424, 427, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965), and reiterated in *3M*, whether a statute of limitations should be tolled in a given instance depends upon whether a Congressional purpose is served thereby. The overriding purpose of the Clayton Act's tolling provision, as enunciated in *3M*, is "to assist private litigants in utilizing any benefits they might cull from government antitrust actions." 381 U.S. at 317, 85 S.Ct. at 1477. According to the dictates of *Leh*, "effect must be given to the broad terms of the statute itself," giving consideration to Congressional opinion "that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." 382 U.S. at 59, 86 S.Ct. at 207. A holding that the Government salt litigation continued to pend with respect to each defendant, until it was concluded for all of them, gives effect to the purpose of § 5(b) and promotes private antitrust litigation.

■ In framing the tolling provision, Congress undoubtedly was cognizant that private treble damage suits usually fol-

---

11. Recommendation 2C of the committee suggested that:
"The suspension period should, as to any defendant against whom a suspension is claimed, extend from the commencement or reopening of the proceeding to (1) the entry of the nolo or consent decree against defendant, or (2) the date of other final action by the highest court acting in the matter."
Report of the Attorney General's National Committee to Study the Antitrust Laws (1955).

low a successful Government action.[12] To allow the private plaintiff sufficient time "to study the Government's case, estimate his own damages, assess the strength and validity of his suit, and prepare and file his complaint," [13] Congress suspended the period of limitations not only during the pendency of the Government action, but also for one year thereafter. An intelligent evaluation of the Government's case can only be made at the conclusion of the entire lawsuit. Before the Government litigation is entirely concluded, the private plaintiff may not be in a position to assess the strength of his case against a particular defendant, or even to formulate a complaint. In addition, during the pendency of the Government litigation, transcripts, documents and exhibits may not be readily available to him. Or it may result that after studying the Government's case a private plaintiff will decide that he has no claim against a defendant for whom the Government litigation had an early termination. Another concern of Congress in passing § 5(b) was to share the greater resources of the Federal government with the private plaintiff of small means. If the Government lawsuit terminates on varying dates for each defendant, the individual plaintiff may be forced to start several different lawsuits, which could drain his resources. Although the rules would permit that plaintiff to move for a continuance and a consolidated trial once he has a lawsuit instituted against each defendant, since such motions are addressed to the Court's discretion, the private plaintiff may still be required to prosecute several different lawsuits, which may be financially impossible. To avoid these difficulties, and to give the

private plaintiff the maximum assistance which can be culled from the Government action, it must be concluded that the Government litigation continues to pend against each defendant until concluded as to all.[14]

■ (2) *Morton and Diamond*—Much of the above discussion also supports the conclusion, contrary to the position of Morton and Diamond, that the Government actions which germinated these cases continued to pend until affirmed by the Supreme Court on October 26, 1965. Based on the Congressional desire to prevent stale actions—an expressed purpose of the four year Federal limitation period—[14a] these defendants argue that plaintiffs may not tack together two Government proceedings to prolong the suspension until the last action has been completed.

The Government litigation with which we are here concerned consists of a criminal prosecution commenced on June 28, 1961, and a civil action commenced on July 11, 1961. Heretofore, no reported case has dealt with this precise factual situation with reference to § 5(b). Analogous situations were presented in Union Carbide & Carbon Corporation v. Nisley, 300 F.2d 561 (10th Cir. 1961) and Dickinson, Inc. v. Kansas City Star Company, 173 F.Supp. 423 (W.D.Mo.1959). In the *Nisley* case the Government's antitrust prosecution began with an indictment filed in June, 1946. In September, 1948, that indictment was dismissed, but on the same date an information was filed charging the same defendants with the identical conspiracy. Thereafter, the action proceeded under the information and was finally concluded on June 2, 1957. Within one year thereafter, in

12. In Neal & Goldberg, supra, note 1, at 622, the authors list 1,880 private suits commenced since the Government electrical industry lawsuits began in 1960 up until 1963. They also estimate that the Government litigation against the motion picture industry prompted at least 1,000 private cases from 1946 to 1959. Conant, supra, note 7 at 178 lists some 381 private cases from 1951 to 1959.

13. S.Rep. No. 619, 84th Cong., 1st Sess. (1955), U.S.Code Congressional and Administrative News, p. 2328.

14. Although it is not a relevant factor for determining the intended scope of § 5 (b), the handling of consolidated private actions such as these will be facilitated by a single termination date for all Government defendants.

14a. See note 15, infra.

*1958*, treble damage actions were commenced against the Government defendants. Raising the statute of limitations defense, they argued that the Government suit ceased to pend when the indictment was dismissed in September, 1948. With little discussion of the issue, the Court held the Government action continued to pend from the time the indictment was filed in 1946 until the action on the information terminated in 1957. Distinguishing the *Nisley* case, defendants herein point out that dismissal of the indictment and filing of the information was simultaneous so that, in essence, there was merely a technical amendment. It is defendants' position that *Nisley* involved only one proceeding and not two.

More approximate to the present situation is the *Dickinson* case which involved both a civil and criminal proceeding. But unlike the present situation, the indictment and complaint were filed simultaneously on January 7, 1950. Guilty verdicts were entered in the criminal action, which ceased to pend on June 17, 1957. Less than six months later, on November 15, 1957, the civil action terminated by consent decrees. At issue in the private treble damage action was whether plaintiffs could use the guilty verdicts as prima facie evidence under § 5(a). Defendants argued that since the private action was not commenced within one year after termination of the criminal proceeding, the guilty verdicts could have no prima facie effect under § 5(a). However, defendants conceded that plaintiffs' cause of action was not barred, thereby recognizing that § 5(b)'s suspension continued throughout both proceedings. This view of the tolling provision was also adopted by the Court, which reasoned that if the period of limitations is suspended for the duration of both Government proceedings, the prima facie effect of a judgment or decree in the first action must be viable throughout both. The Court's conclusion rested in part on a presumed congressional intent, which was expressed as follows:

"When Congress enacted the evidentiary and tolling provisions of Section 5, *supra*, it is manifest that they (sic) made the provisions thereof applicable to both criminal and civil actions brought by the Government. The only assumption to be made therefrom is that the Congress knew that in some instances both such types of action would be commenced simultaneously by the Government—one to punish for past violations of the Anti-Trust Laws and the other to prevent future violations in respect to an identical plan or scheme of violation. There is no legislative history of Section 4 or 5 of the Clayton Act from which it may be inferred that the Congress intended the evidentiary or tolling provisions in question to be made applicable only to the first action terminated, where they were concurrently so brought." 173 F.Supp. at 425.

Since Congress must have been well aware of the Justice Department's authority to bring both civil and criminal actions, the *Dickinson* analysis seems reasonable and logical. Therefore, this Court is of the opinion that the statute remains tolled on the causes of action asserted herein through October 25, 1966, one year after the Government civil action ceased to pend on October 26, 1965.

Defendants have argued that Congress did not intend to toll the statute throughout *successive* actions. For this position there is support in the *Dickinson* opinion, in which the Court intimated that the limitation period of successive Government actions may not be joined together to prolong the suspension under § 5(b). It may be that in some instances tolling the statute during successive actions would result in treble damage claims of such vintage that it would be patently unreasonable to assume that Congress meant to allow "tacking" under § 5(b). But here, the civil complaint was filed within two weeks of the indictment. Although not simultaneously commenced, the two actions were pending concurrently. I think this situation falls within permissible limits so that the suspension could continue until the conclusion of the civil suit.

This construction, in defendants' view, tends to frustrate congressional policy against procrastination of private actions. In a Senate Report relating to the 1955 Amendments, the Congress expressed concern over prolongation of stale claims, undue impairment of efficient business operations, and overburdening of Court calendars.[15] Tacking together the Government actions involved here has these vices, so defendants argue. In the Senate Report just mentioned, the legislators referred to protracted Government proceedings plus a lengthy statute of limitations. To prevent the adverse effects of such a scheme, Congress gave private litigants only one year following termination of the Government proceedings to institute their actions. Nothing in the statute attempts to shorten Government proceedings. On the contrary, the Congressional Committee felt it "highly desirable" to suspend the limitation during the Government proceedings. It would seem, then, that the short period of one year serves to prevent stale claims and the other disadvantages noted by the committee report.

Because the Government civil action here produced no new testimony, being submitted on the record made in the criminal case, defendants maintain that the fruits of the Government action were available to plaintiffs following completion of the criminal case. It is suggested that they could well have initiated their review and assessment of the Government case and their respective claims during the year following termination of the criminal action. This argument suffers from hindsight to the extent that private plaintiffs may not have been aware that the civil action would produce little else in the way of discovery, documents, testimony or exhibits. Additionally, questions may have been raised in the civil suit which had not been previously determined by the criminal action. If this were so, then the private actions could conceivably progress at a faster pace.

■ Defendants also claim prejudice, emphasizing that private plaintiffs are under no obligation to preserve records during the pendency of Government proceedings. Thus, it is asserted that discovery will be impaired. The purpose of a period of limitations was summarized in Burnett v. New York Central R. Co., 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965), as follows:

"Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.' Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348–349 [64 S.Ct. 582, 586, 88 L.Ed. 788]. Moreover, the courts ought to be relieved of the burden of

15. In Senate Report Number 619, 84th Congress, 1st Session, the Committee · stated that:
"* * * in many instances the long duration of such [government] proceedings taken in conjunction with a lengthy statute of limitations may tend to prolong stale claims, unduly impair efficient business operations, and overburden the calendars of courts. The committee believes the provision of this bill will tend to shorten the period over which private treble-damage actions will extend by requiring that the plaintiff bring his suit within 4 years after it accrued or within 1 year after the Government's case has been concluded.
"While the committee considers it highly desirable to toll the statute of limitations during a Government antitrust action and to grant plaintiff a reasonable time thereafter in which to bring suit, it does not believe that the undue prolongation of proceedings is conducive to effective and efficient enforcement of the antitrust laws. The present bill would assure all plaintiffs of at least 4 years from the time their cause of action accrued in which to institute suit."

trying stale claims when a plaintiff has slept on his rights."

"This policy of repose, designed to protect defendants, is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights."

These purposes are not undermined by suspending the statute during the two proceedings here. When Government suits are initiated, defendants thereby receive notice that private treble damage actions may, and most likely will, follow thereafter. During this time potential plaintiffs will realize that it is to their advantage to retain records, since they will have the burden of proving their case. As defendants herein seem to acknowledge, their own records will be preserved and utilized during the defense of the Government action. Finally, because Congress has taken the position that private treble damage suits constitute a formidable means of enforcing the antitrust laws, the protection for defendants embodied in statutes of limitations is outweighed in this setting by the interest in assisting treble damage plaintiffs to vindicate their own, as well as the public, interest. Taking these factors into consideration, as well as those heretofore mentioned, the Government action continued to pend until October 26, 1965, and the statute remains tolled for one year thereafter. Since the last day for filing suit will be October 25, 1966, all of the instant cases were timely brought.

(3) *Non-Government Defendants*— The question of when the Government proceedings terminated as to defendants in these cases who were not parties to the Government action must be deferred until it is ascertained whether § 5(b) has any application to such defendants, which is the next problem to be resolved.

C. *Defendants Covered by § 5(b)*—

Among the many defendants in these cases are several who were not parties to the Government proceedings, although most of this group were specifically named as conconspirators.[16] These defendants maintain that § 5(b) does not operate to toll the statute against them, citing a block of movie theatre cases holding that this section cannot be applied to non-Government defendants.[17] Again relying on *3M* and *Leh,* plaintiffs assert that the cases cited by defendants are no longer controlling. In neither case was the Supreme Court squarely presented with this issue. The only non-Commission defendant involved in *3M* was not a party to the Supreme Court appeal, having successfully contended in the District Court that § 5(b), even if tolled by Commission proceedings, did not cover non-defendants. In *Leh,* the sole non-Government defendant was dismissed from the suit before the District Court passed upon the tolling issue and therefore was not a party to the Supreme Court review. Even though neither decision explicitly passed upon the question raised here, the broad interpre-

---

16. Defendants who were named coconspirators by the United States but not defendants are American, Barton, Hardy, Cutler-Magner and Cargill. Those who were neither defendants nor named coconspirators in the Government case include Cargo Carriers, Dow and Gunther. The latter is involved in the Missouri treble damage case, but has not yet been transferred to this Court. Dow is named by Michigan plaintiffs as a coconspirator, but not as a defendant. Originally the Iowa plaintiffs named Dow as a defendant, but immediately dismissed it from the action.

17. See, e. g., Sun Theatre Corp. v. RKO Radio Pictures, Inc., 213 F.2d 284 (7th Cir. 1954); Momand v. Universal Film

Exchange, Inc., 172 F.2d 37 (1st Cir. 1948), cert. denied, 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949); Court Degraw Theatre, Inc. v. Loew's Inc., 172 F.Supp. 198 (E.D.N.Y.1959); Charles Rubenstein Inc. v. Columbia Pictures Corporation, 154 F.Supp. 216 (D.Minn. 1957), aff'd, 289 F.2d 418 (8th Cir. 1961); Samuel Goldwyn Prod., Inc. v. Fox West Coast Theatres Corp., 146 F.Supp. 905 (N.D.Calif.1956); Electric Theatre Co. v. Twentieth Century Fox-Film Corp., 113 F.Supp. 937 (W.D.Mo. 1953); Christensen v. Paramount Pictures, Inc., 95 F.Supp. 446 (D.Utah 1951). Most of these cases involve subsidiaries of, or successors to, named Government defendants.

tation given § 5(b) in *Leh* and *3M* suggests that the Supreme Court would hold that it tolls the statute on a cause of action asserted against a non-Government defendant; therefore, that interpretation is hereby adopted.

The treble damage action in *Leh* was brought against six of eight Government defendants, as well as a party not named in the Government litigation. As noted, the non-Government defendant was no longer in the case when it reached the Supreme Court. Defendants raised the statute of limitations as a bar to the action, to which plaintiffs replied that the Clayton Act operated to suspend the statute. Application of § 5(b) was resisted by defendants on the ground that the private claims were not based in whole or in part on the matters complained of in the Government suit since different overt acts were alleged, involving different parties, time periods, and geographic areas. "The lower courts found that plaintiffs' complaint was not based in whole or in part on any matter complained of in the government proceeding principally because of the differences in the defendants named in the two suits and in the period of the conspiracies alleged." 382 U.S. at 62, 86 S.Ct. at 209. Taking the view that these differences do not alter the effectiveness of § 5(b), the Supreme Court reversed, and held that § 5(b) may be invoked where there is "substantial identity" between the private complaint and the Government's allegations. In so holding, the Court rejected the restricted view of § 5(b) adopted in Steiner v. 20th Century Fox Film Corporation, 232 F.2d 190 (9th Cir. 1956), which approached § 5(b) in terms of the collateral estoppel principles applicable to § 5(a). The Court stated, "[T]he private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants. * * *" 382 U.S. at 59, 86 S.Ct. at 207.

 As indicated, the private defendants in *Leh* included some, but not all, of the Government defendants. At the very least then, *Leh* stands for this proposition: Section 5(b) may be applied to one Government defendant in a private action without regard to the absence of other Government defendants. Another analysis of *Leh* is suggested by this reference to *3M:*

> "The action upon which plaintiff relied as suspending the running of limitations was a Federal Trade Commission proceeding under § 7 against Minnesota Mining but not against Essex. Essex was not a party to the interlocutory appeal in the private action and no contention was made here that the difference in parties prevented tolling of limitations as to Minnesota Mining." 382 U.S. at 63, 86 S.Ct. at 209.

Reading *Leh* in light of this passage, it can be interpreted thus: Section 5(b) may be applied to a Government defendant in a private action despite the presence of a non-Government defendant. In sum, *Leh* teaches that a private cause of action may stem from prior Government litigation even though there is lacking complete identity between the defendants named by the Government and those named by the private litigant. The Court stated:

> "[W]e cannot conclude that a private claimant may invoke § 5(b) only if the conspiracy of which he complains has the same breadth and scope in time and participants as the conspiracy described in the government action on which he relies." 382 U.S. at 63, 86 S.Ct. at 209.

If, then, a treble damage plaintiff can meet the "substantial identity" test even though his cause of action does not include the same participants as those described in the Government complaint, a third proposition can be distilled from *Leh:* Section 5(b) may be applied to suspend the period of limitations against a private defendant, notwithstanding the fact that he was neither a party to, nor a named coconspirator in the Government action.

 While recognizing that *Leh* did not result in the application of § 5(b)

to any non-Government defendant, this interpretation is nonetheless consonant with the Court's admonition that "effect must be given to the broad terms of the statute itself * * *." Section 5(b) tolls the statute on every private right of action, and requires only that the claim be based in whole or in part on the matters complained of in the Government litigation. On its face, that section is not concerned with the defendants against whom the limitations period may be tolled. Rather, the focus is upon the potential plaintiff—the statute on every private right of action is tolled. The movie theatre cases cited by defendants interpolated into § 5(b) the language of § 5(a) which refers to defendants, and to estoppel between parties. The rationale and interpretative approach of these decisions is inconsistent with the Supreme Court's approach in *Leh,* which holds that the matters complained of in the two actions need only have a substantial similarity, and not such an identity as would result in an estoppel between the parties to the Government action. Further, *Leh* implies that any difference in the defendants named in the two actions may often be unrelated to the question of whether the private claim is based in part on the Government suit. The Court stated:

> "In suits of this kind, the absence of complete identity [between defendants] may be explained on several grounds unrelated to the question of whether the private claimant's suit is based on matters of which the Government complained. In the interim between the filing of the two actions it may have become apparent that a party named as a defendant by the Government was in fact not a party to the antitrust violation alleged. Or the

private plaintiff may prefer to limit his suit to the defendants named by the Government whose activities contributed most directly to the injury of which he complains. *On the other hand, some of the conspirators whose activities injured the private claimant may have been too low in the conspiracy to be selected as named defendants or co-conspirators in the Government's necessarily broader net."* 382 U.S. at 63–64, 86 S.Ct. 209. (Emphasis added.)

Thus the Court acknowledged that a private plaintiff may well name as defendants persons who were "too low in the conspiracy" to be included as named defendants, or even named coconspirators, in the Government suit. Further, it implies that the mere fortuity that a defendant who allegedly injured the private claimant did not gain a place in the Government litigation is not a controlling factor in determining whether the private claimant has met the substantial identity test.[18] Based on this analysis of *Leh;* the Court's apparent desire to give private litigants every benefit they might cull from the Government litigation; as well as those factors previously mentioned, I conclude that § 5(b) may be applied to non-Government defendants. In addition, it should be noted that the passage just quoted lends some support to the view that no distinction need be made between private defendants named as coconspirators by the Government and those who were not so named. As the Court suggested, this, too, depends upon the strategy adopted by the Government which has no bearing on the private plaintiff's compliance with the substantial identity test.

Among the objections voiced by the non-Government defendants here is that

---

18. In *Leh* the Court tested the plaintiffs' complaint with respect to the type of conspiracy alleged; the parties involved; the time period covered; and the geographic area of impact, comparing all of these factors with the Government complaint. However, no suggestion was made that, to comply with the substantial identity test, the private claim must overlap with the Government allegations in each of these areas. Therefore, it is conceivable that a private cause of action could be based in part on a Government litigation with reference to the conspiracy, time period, and area, even though none of the private defendants were parties to that proceeding.

this construction of § 5(b) penalizes them for the actions of named Government defendants over whom they have no control. In the context of the present cases, it is argued that these defendants could not prevent prolongation of the Government actions by Morton and Diamond, who contested the actions throughout, including a Supreme Court appeal. Allusions have been made to the due process clause, as well as to the "right" of non-Government defendants to rely upon the four year statute of limitations. As noted above, one gains no vested right to a particular limitations period, perhaps with the exception of the situation where an attempt is made to revive a barred claim by retroactive extension of the statute. But this is not the case here, and this Court finds unpersuasive the notion that these defendants have a right to a four year statute. Neither is the due process argument compelling. While it is true that non-Government defendants have little control over the course of that litigation, no protected rights are prejudiced thereby. Regardless of the length of the Government proceedings, these defendants are not deprived of their day in court. It is claimed, however, that when that day finally arrives, non-Government defendants may be hampered by lack of evidence, since they would have no reason to preserve records during the pendency of the Government action. This assumes that a non-Government defendant would have no inkling that he might become a treble damage defendant, an assumption which seems unwarranted. Certainly a defendant would have enough familiarity with its own affairs to ascertain whether the potential exists that a treble damage claim will be asserted. Another contention is that if the statute is tolled for every member of any industry which is the subject of a Government suit, normal business activities will be hampered, particularly the sale of a business clouded with potential treble damage claims. This situation is not unique in the antitrust area and certainly it is not uncommon to arrange for assumptions and disclaimers of pre-existing liabilities in the sale of a business. None of these arguments suggest that tolling the statute for non-Government defendants will result in hardships of such magnitude that it is unreasonable to think that Congress intended this result. Rather, tolling the statute here promotes the Congressional desire to give private litigants every benefit to be culled from the Government litigation.

D. *Plaintiffs Benefited by § 5(b)*—

Some of these actions are brought by representative plaintiffs on behalf of members of a class of governmental entities. Defendant International has taken the position, particularly with reference to the *Milwaukee* case, that the timeliness of actions by members of the class who subsequently intervene in a class action, is to be determined by reference to the date of the motion to intervene, or the Order granting such motion. In other words, it is International's position that the institution of a representative action does not mark the commencement of the suit for members of the class who thereafter seek to intervene in the action in their own name.

The significance of this problem is diminished by the conclusion that the Government action continued to pend for all defendants until October 26, 1965. Since the limitations period will not expire until October 25, 1966, all plaintiffs who have intervened heretofore are within the statute, even without relation back to the date on which the class action was commenced. Thus, it is unnecessary to consider this question. It might be noted, however, that Union Carbide & Carbon Corporation v. Nisley, 300 F.2d 561 (10th Cir. 1962), a treble damage action, did consider the issue and held that institution of a class action served to toll the statute of limitations for all members of the class.

Additionally, this Court entered an Order closing the various classes involved in these actions as of a day certain. Class action representatives were also required to file lists of members for whom damages are claimed. Defendants are thereby protected from last minute

additions to the class against whom they might not have formulated a defense.

E. *Matters Complained of—*

The foregoing discussion has assumed that the matters complained of in these private actions are based in whole or in part on the Government litigation within the meaning of § 5(b). In *Leh*, the Court adopted a test of "substantial identity" and found that the private action was based on the Government suit even though there were differences in (a) defendants, (b) the time period of the conspiracies alleged, and (c) the geographic area involved, and (d) certain overt acts in furtherance of the alleged conspiracy.

It is not necessary to detail the allegations of these private complaints and the Government complaint, since defendants do not seriously question that the actions herein share a substantial identity with the Government proceedings. Combined, these plaintiffs focus on a geographic area wider than that involved in the Government action; they assert claims against defendants who were not parties to the Government suit, and some seek damages for a period beyond the scope of that to which the Government directed its attention. Despite these variances, the core of these complaints is an alleged conspiracy to fix the prices of rock salt sold to governmental entities. As such, the essence of these private actions is substantially similar to the matters complained of by the Government and thus within the scope of § 5(b).

In summary, the Court has determined:

1. That the date which governs the commencement of the tolling of the statute of limitations under § 5(b) of the Clayton Act is June 28, 1961.

2. That the date which governs the termination of the tolling of the statute of limitations under § 5(b) of the Clayton Act is October 25, 1966.

3. That § 5(b) of the Clayton Act applies to all defendants named in these treble damage actions.

4. That all plaintiffs, including intervenors and members of a class, are entitled to the benefits of § 5(b).

5. That the matters complained of in these treble damage actions are based in whole or in part on the Government litigation within the meaning of § 5(b).

It is so ordered.

## SUPPLEMENTAL DECISION

(§ 5(a), Clayton Act)

This Court's Pretrial Order of November 23, 1965, directed the parties to brief and argue several questions concerning the interpretation and application of § 5(a) of the Clayton Act, which allows a final judgment or decree against a defendant in a Government antitrust proceeding to be used as prima facie evidence by any other party against such defendant. These consolidated treble damage actions grow out of civil and criminal actions by the United States charging some of defendants herein with concerted action in violation of the antitrust laws. Plaintiffs are the States of Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Wisconsin, and certain governmental units within these States. In addition, the Milwaukee class action includes municipalities in the States of Kansas, Virginia, and Tennessee. Defendant companies, producers or distributors of rock salt, are American, Barton, Carey, Cargill, Cargo Carriers, Cutler-Magner, Diamond Crystal, Hardy, International and Morton.[1]

The Government proceedings began with indictments filed against Carey, Morton, Diamond, and International on

---

1. These cases have been consolidated pursuant to a national coordination program for treble damage suits arising out of the Government antitrust proceedings involving the salt industry. Cf. Neal & Goldberg, The Electrical Equipment Antitrust Cases: Novel Judicial Administration, 50 A.B.A.J. 621 (1964). Although all defendants are not named in each of these cases, the parties on either side are generally united in approach and will be treated as a group, unless otherwise noted.

June 28, 1961. Shortly thereafter, on July 11, 1961, a civil complaint was filed against these same four defendants, alleging—as did the indictment—a conspiracy to fix the prices of rock salt. Although not named defendants, American, Barton, Cargill, Cutler-Magner, and Hardy were all listed as conconspirators in both the indictment and civil complaint. Before the criminal trial commenced, Carey entered a plea of *nolo contendere* to the indictment on March 26, 1962. Also on that date Carey consented to a judgment against it on the civil complaint. Thereafter, the remaining three defendants proceeded to trial before a jury, which returned a verdict of not guilty on June 7, 1962. The civil action, which had been suspended during the criminal trial, was then reactivated. On November 4, 1963, a consent judgment was filed against International on the civil complaint. Also on November 4, 1963, a stipulation was filed between Morton and Diamond and the United States in which the parties agreed that the civil case could be tried on the record made in the criminal action, with the addition of answers by Morton and Diamond to certain interrogatories of the United States. On this record, the trial court's Memorandum Decision of August 6, 1964, concluded that there was an illegal conspiracy to fix the prices of rock salt. Findings of Fact and Conclusions of Law, along with a final judgment, were entered on November 24, 1964. Subsequently, on February 19, 1965, the judgment was amended, and then affirmed on appeal to the Supreme Court on October 26, 1965. 382 U.S. 44, 86 S.Ct. 181, 15 L.Ed.2d 36.

Plaintiffs in these actions seek to derive prima facie benefit from the final judgment in that civil case pursuant to § 5(a) of the Clayton Act. Among the issues to be determined are these: (A) Against which defendants in the instant cases does the Government judgment have prima facie effect; (B) What is the scope of the estoppel effect of the judgment, with respect to (1) the existence of a conspiracy, (2) the product involved, (3) the time period covered, and (4) the geographic area; and (C) What is the extent of the benefit under § 5(a) for plaintiffs (1) specifically named in the prior Government action, (2) within the geographic area of the Government suit, and (3) outside that geographic area?

▆▆▆▆ The answers to these questions turn upon the language of § 5(a) and the congressional policies it is designed to serve. Originally enacted in 1914, the present § 5(a) reads as follows:

"A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title." [2]

2. 38 Stat. 731, as amended 15 U.S.C. § 16 (a) (1964 ed.). As enacted in 1914, § 5(a) was part of a more inclusive section 5 which included the provision for tolling the statute of limitations on private actions during the pendency of Government proceedings. The prima facie and tolling provisions were separated into subsections (a) and (b), respectively, by a 1955 amendment. No other significant changes were made in the prima facie section by that amendment. See generally, Timberlake, The Use of Government Judgments in Subsequent Treble Damage Actions Under the Antitrust Laws, 36 N.Y.U.L.Rev. 991 (1961); Note, Government Antitrust Judgments as Evidence in Private Actions, 65 Harv.L.Rev. 1400 (1952); Comment, Clayton Act, Section 5: Aid to Treble Damage Suitors?, 61 Yale L.J. 417 (1952).

This provision had its roots in the Congressional belief that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318, 85 S.Ct. 1473, 1477, 14 L.Ed.2d 405 (1965). Concerned with the lack of resources—financial and otherwise—of private persons injured by antitrust violations, Congress intended, through § 5(a), to share with them the greater resources of the Federal government. As the Court stated in Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568, 71 S.Ct. 408, 95 L.Ed. 534 (1952):

> "Congressional reports and debates on the proposal which ultimately became § 5 reflect a purpose to minimize the burdens of litigation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions. * * * " 3

Thus it is that the prima facie effect of § 5(a) eases the private litigant's burden of going forward with the evidence. Section 5(a) has still another purpose, which is served by the proviso clause. Thoroughly reviewing the congressional debates, and other legislative history, the Court in Twin Ports Oil Co. v. Pure Oil Co., 26 F.Supp. 366, 371 (D.Minn. 1939) enunciated the policy behind the proviso:

> "Congress apparently intended to encourage consent judgments and decrees. It sought to induce a prompt surrender to the Government's de-

mands by excluding consent judgments and decrees from the prima facie rule." The consent decree proviso, then, inures to the benefit of the Government by saving the time and expense of a protracted trial.4 General Electric Co. v. City of San Antonio, 334 F.2d 480 (5th Cir. 1964). The issues presented in these proceedings must be resolved in the context of this statutory scheme.

### A. Defendants Covered by § 5(a)—

The defendants in these cases had varying relationships with the prior Government action. Several were not named as defendants at all; two were named defendants but entered into consent decrees; and two others contested the Government's claims throughout.

▬▬ (1) *Non-Government Defendants*—Although some plaintiffs maintain that the decree can have prima facie effect against the non-Government defendants here, the plain wording of the statute requires rejection of this argument. Section 5(a) talks of a final judgment or decree to the effect that a defendant has violated the antitrust laws may have prima facie effect against *such defendant* in a private action against *such defendant*. Clearly, the purpose of this language was to restrict the application of § 5(a) to persons who have had their day in court against the Government's allegations. Any other result *would raise serious constitutional questions*, which was suggested in Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 569 (10th Cir. 1961), when the Court said, "The competency of a government judgment in a private suit is

---

3. In a message to Congress encouraging the provisions of § 5(a), President Wilson stated:

> "I hope that we shall agree in giving private individuals who claim to have been injured by these processes the right to found their suits for redress upon the facts and judgments proved and entered in suits by the Government * * *. It is not fair that the private litigant should be obliged to set up and establish again the facts which the Government has proved. He can not afford, he has not the power, to make

use of such processes of inquiry as the Government has command of. Thus shall individual justice be done while the processes of business are rectified and squared with the general conscience." 51 Cong.Rec. 1964 (1914).

4. The desire to aid private litigants embodied in the main part of § 5(a) conflicts to some extent with the consent decree proviso. See Comment, Consent Decrees and the Private Action: An Antitrust Dilemma, 53 Calif.L.Rev. 627 (1965).

necessarily restricted to the requirements of due process." [5] Even though § 5(a) does not create an absolute estoppel, the due process consideration undoubtedly influenced those Courts which have indicated that this section does not authorize prima facie use of a Government decree against non-Government defendants. Cf. Buckhead Theatre v. Atlanta Enterprises, Inc., 327 F.2d 365 (5th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 158, 13 L.Ed.2d 92 (1964); Sun Theatre Corp. v. RKO Radio Pictures, Inc., 213 F.2d 284 (7th Cir. 1954); DeLuxe Theatre Corp. v. Balaban & Katz Corp., 88 F.Supp. 311 (N.D.Ill.1950). The one decision heavily relied upon by plaintiffs, Homewood Theatre, Inc. v. Loew's Inc., 110 F.Supp. 398 (D.Minn.1952), appeal dismissed, 207 F.2d 263 (8th Cir. 1953), is not to the contrary. Plaintiffs in that treble damage action sought the benefit of the Government decree in the *Paramount* case, an antitrust action involving the movie theatre industry.[6] M.A.C., a non-Government defendant, argued that the *Paramount* decree was not admissible as prima facie evidence against it. While the Court declined to decide this question directly, it held that M.A.C. could not object to the admissibility of the decree against the Government defendants, and said:

> "Suffice it to state that the decrees being admissible as to all of the distributor defendants, they constitute prima facie evidence as to them, and the Minnesota Amusement Company being a beneficiary and a part of the local conspiracy, which is a part of the national conspiracy, *it cannot object to the admission of such evidence in that it having knowingly joined the conspiracy here, all acts of the conspirators in furtherance of the conspiracy necessarily are admissible as to it.* Moreover, the evidence as to the local conspiracy is ample to sustain such finding as to the distributor defendants as well as M.A.C. without the evidentiary support of the decrees in the Paramount cases." 110 F.Supp. at 411. (Emphasis added.)

Some plaintiffs contend that *Homewood* establishes that a Government decree is admissible for prima facie effect against a non-Government defendant. The underscored language cannot be so read. By it the Court undoubtedly meant to indicate that M.A.C., the non-Government defendant, could not preclude admission of the Government decree against the Government defendants even if the decree were inadmissible as prima facie evidence against it. At least one other Court has so interpreted this decision. See Sun Theatre v. RKO Radio Pictures, Inc., supra, 219 F.2d at 293. While *Homewood* does not stand for the proposition that a Government decree is admissible as prima facie evidence against non-Government defendants, it does indicate that the presence of these defendants does not render § 5(a) inapplicable to the Government defendants. Several other cases also subscribe to this view. See, e. g., Loew's Inc. v. Cinema Amusements, 210 F.2d 86 (10th Cir.), cert. denied, 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115 (1954); Charles Rubenstein, Inc. v. Columbia Pictures Corp., 176 F.Supp. 527 (D.Minn.1959), aff'd 289 F.2d 418 (8th Cir. 1961); Homewood Theatre, Inc. v. Loew's, Inc.., supra; Christensen

---

5. "As originally presented to the House, § 5 also made a 'judgment or decree' rendered in a 'suit or proceeding in equity brought by or on behalf of the United States' conclusive against any prospective treble-damage plaintiff. Opponents of this clause vigorously challenged the constitutionality of binding a party who had never had his 'day in court.' "
Appendix to dissenting opinion of Mr. Justice Black in Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.,

381 U.S. 311, 332, 85 S.Ct. 1473, 1484, 14 L.Ed.2d 405 (1965).

6. United States v. Paramount Pictures, Inc., 66 F.Supp. 323, 70 F.Supp. 53 (S.D. N.Y.1946), aff'd in part, rev'd and remanded in part, 334 U.S. 131, 68 S.Ct. 915 (1948), 85 F.Supp. 881 (S.D.N.Y. 1949), aff'd per curiam, 339 U.S. 974 (1950). The history of that litigation and the private treble damage suits which followed is recounted in Conant, Antitrust in the Motion Picture Litigation (1960).

v. Paramount Pictures, Inc., 95 F.Supp. 446 (D.Utah 1950). The non-decree defendants here vigorously protest such a course, arguing that the prejudicial effect of the decree cannot be obliterated by curative or cautionary instructions. It is argued that in most of the cases in which a decree has been admitted where the defendants are mixed, the trial has been before the Court alone. Based on the contention that the emotive impact of a Government decree cannot be erased from a juror's mind, these defendants have moved for separate trials. Disposition of these motions will not be undertaken here, but should they be denied, due consideration will be given to the proper method of handling the decree before a jury.

 (2) *Morton and Diamond*—At the other end of the spectrum are Morton and Diamond, who actively contested the Government's allegations in both the criminal and civil cases. Taking the only position consistent with the statutory provision, these defendants concede the decree has prima facie significance for them. The thrust of their arguments is directed toward the scope of its estoppel effect, which will be ascertained below.

 (3) *Carey*—Similarly, there is no significant dispute between the parties as to the position of Carey. Having satisfied the requirement of the proviso clause of § 5(a) that its consent decree be entered before the taking of any testimony, Carey escapes the onus of the prima facie provisions. But like the non-Government defendants, Carey is also concerned with the prejudicial effect which the decree could have upon it in a consolidated trial. Appropriate action will be taken at a later stage to minimize the possible prejudice.

 (4) *International*—Although it consented to a judgment against it in the civil case, International's situation is distinct from Carey's. Contesting the criminal action, International did not capitulate until after the testimony was received and a verdict reached. Plain-

tiffs argue that because the subsequent civil action was submitted on the record made in the criminal case, International's decree does not satisfy the requirement of § 5(a)'s proviso clause. To support this position, they attempt to show that the stipulation between Morton, Diamond and the United States, concerning submission of the civil case on the criminal record, was filed before International's consent decree was entered. On this analysis, the testimony in the civil case was submitted before the consent decree was entered. Both the stipulation and decree were filed on the same date, November 4, 1963. Without speculating as to which was filed first, this Court is of the opinion that the Government decree should nonetheless have prima facie value against International because the actual taking of testimony occurred before the consent decree was entered. Arguing that neither its consent decree nor the judgment in the civil case determined that it violated the antitrust laws, International maintains they do not meet the criteria of § 5(a). In addition, it is argued that due process forbids giving prima facie effect to the judgment because International was not a party to that judgment and did not have its day in court with respect to the allegations of the civil complaint.

 The last contention is clearly untenable. The indictment and complaint were virtually identical. Fully participating in the criminal trial, International had an opportunity to litigate all issues raised. Also without merit is the argument that due process prohibits use of the decree against International. Section 5(a) itself is based on the premise that once a defendant has his day in court against the United States, he may not thereafter insist on litigating the same issues against another party. That the constitution does not require that a party be afforded a day in court against every new party with respect to questions previously litigated is indicated in United States v. United Air Lines, 216 F.Supp. 709 (D.Wash.: D.Nev.1962), aff'd on this issue sub nom

United Air Lines v. Wiener, 335 F.2d 379, 404 (9th Cir.), cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964):

" * * * [N]o constitutional right is violated where the thing to be litigated was actually litigated in a previous suit, final judgment entered, and the party against whom the doctrine [of res judicata] is to be invoked had full opportunity to litigate the matter and did actually litigate it." 216 F. Supp. 726.

If the application of res judicata can constitutionally foreclose a defendant from relitigating with a new party issues previously tried, *a fortiori* it is constitutionally permissible to give only prima facie effect to the matters previously determined. This follows because under the prima facie rule a defendant may present additional evidence with respect to questions previously litigated, while under res judicata he is completely bound by the former litigation.[7]

■■ International's other contention stems from the language of § 5(a) which states that a judgment or decree "to the effect that a defendant has violated" the antitrust laws shall have prima facie effect. Emphasizing that it was not a party to the judgment entered against Morton and Diamond in the civil case, that it was not circumscribed in any respect by that decree, International concludes that the judgment did not and could not determine that it was in violation of the antitrust laws. In addition, this defendant maintains that the recital in its consent decree that it was entered before the taking of any testimony, and without adjudicating any question of law or fact, cannot be impugned in these actions. This phrase has appeared in other consent decrees, but has not prevented

the courts from considering whether it would be consistent with the purpose of § 5(a) to allow the decree to exempt a defendant from the prima facie rule.[8] Moreover, the § 5(a) requirement that the judgment must be to the effect that a defendant has violated the antitrust laws must have been designed to limit § 5(a) to determinations adverse to defendants since from the beginning Congress excluded from that section decrees favorable to defendants.[9] It should not be construed to demand an explicit statement in the judgment or decree that Defendant X has violated the antitrust laws. Judged in light of what the complaint charged, it is possible to ascertain that International's consent decree effectively determines that it violated the antitrust laws. In addition, the Memorandum Decision and Findings of Fact on which the Government civil judgment is based also made determinations to the effect that International participated in an illegal conspiracy. Because the testimony on which these determinations were made was actually taken before the consent decree was entered, the proviso clause of § 5(a) has not been satisfied. That clause was meant to encourage prompt capitulation, thereby saving the Government the time and expense of a full scale trial. In this instance, no saving was passed on to the United States. In the criminal trial, which lasted several weeks, the Government was compelled to present evidence in support of its allegations. International actively participated in this litigation and thus had its day in court against the Government. Although the Government saved no time or money, this defendant assuredly advanced its position by virtue of the trial. Having the advantage of watching the evidence develop in the criminal proceeding,

---

7. See notes 12–15, infra, and accompanying text.

8. Barnsdall Refining Corporation v. Birnamwood Oil Company, 32 F.Supp. 308 (E.D.Wis.1940); Homewood Theatre, Inc. v. Loew's, Inc., 110 F.Supp. 398 (D.Minn.1952), appeal dismissed, 207 F.2d 263 (8th Cir. 1953); Webster Rose-

wood Corp. v. Schine Chain Theatres, Inc., 157 F.Supp. 251 (N.D.N.Y.1957), aff'd, 263 F.2d 533 (2 Cir.), cert. denied, 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959).

9. Twin Ports Oil Co. v. Pure Oil Co., 26 F.Supp. 366, 374 (D.Minn.1939).

International could thereafter shrewdly assess its chances of success in the civil case. Even though the jury returned a verdict in its favor, after reviewing the testimony International may well have concluded that in the civil case, with a lighter burden of proof upon the Government, it would not fare so well. Under these circumstances, this defendant should not be granted both the protection of the proviso clause of § 5(a) and the opportunity to fully contest the Government's case.

Other cases have dealt with this issue where consent decrees have been entered after the granting of new trials, or where additional testimony is taken on remand. Webster Rosewood Corporation v. Schine Chain Theatres, Inc., 157 F.Supp. 251 (N.D.N.Y.1957), aff'd 263 F.2d 533 (2d Cir.), cert. denied, 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959); Sablosky v. Paramount Film Distributing Corporation, 137 F. Supp. 929 (E.D.Pa.1955) and Homewood Theatre, Inc. v. Loew's, Inc., supra, all were concerned with consent decrees entered in the Paramount case after appeal to the Supreme Court and remand for further evidence. A synopsis of these events is contained in Homewood:

"The original decree entered by the expediting court before the appeal to the Supreme Court was not, of course, a consent decree. Both Paramount and RKO, as well as the other defendants, challenged the Government's contention that there was any conspiracy as alleged. There was an extended trial, and in the decree of February 3, 1947, all the defendants, including Paramount and RKO, were * * * enjoined * * *. From this decree, an appeal was taken by all of the defendants to the Supreme Court of the United States, which affirmed the findings of the District Court as to runs and clearances, but remanded the case for the consideration of the provision of the decree as to competitive bidding * * *." 110 F.Supp. at 409–410.

Defendants argued that since the consent decrees were entered before the taking of any testimony on remand, they fell within the proviso of § 5(a) and thus could not be used as prima facie evidence by the treble damage plaintiffs. Rejecting this contention, the Court pointed out that "[t]he remand was in effect a mere continuation of the first trial, with additional issues to be determined, none of which concerned the portions of the decree as to runs and clearances." 110 F.Supp. at 410. Since the issues with which the private plaintiffs were concerned were those on which no new testimony was taken, the Court found the decrees subject to the prima facie rule. The *Sablosky* and *Webster Rosewood* cases reached the same result.

Barnsdall Refining Corp. v. Birnamwood Oil Co., 32 F.Supp. 308 (E.D.Wis. 1940) and Dalweld Company v. Westinghouse Electric Corp., 252 F.Supp. 939 (S.D.N.Y.1966) both involved pleas of *nolo contendere* entered after new trials had been ordered. *Barnsdall* was concerned with a criminal antitrust action in which the jury returned a verdict of guilty against all defendants. Before judgment was entered, however, a new trial was granted the Barnsdall Company, but before this trial commenced, a plea of *nolo contendere* was entered. In the subsequent treble damage action defendant was successful in arguing that the plea was entered before the taking of any testimony within the meaning of § 5(a). In accepting defendant's argument the Court relied on the rule that a new trial proceeds as if none had ever gone before.

Westinghouse, the defendant in *Dalweld*, initially pleaded not guilty to the indictment in a prior Government antitrust suit. Later, it sought to substitute a *nolo* plea, which the Court refused to accept. Trial commenced but the jury could not reach a verdict and was discharged. A new trial was ordered and again Westinghouse tendered a *nolo* plea. This time it was accepted, the trial court indicating that "the refusal of a nolo contendere plea does not appear to be required in order to protect treble dam-

age claimants or to serve the public interest," primarily because Westinghouse was a minor figure in the conspiracy there alleged. United States v. Engelhard-Hanovia, Inc., 252 F.Supp. 605, 607 (S.D.N.Y.1964). Although accepting the treble damage plaintiffs' contention "that to implement the proviso's objective of early capitulation, the language should be read to confront defendants with a 'statutory choice-point' * * *," the court in *Dalweld* took into account that it is not solely within the control of a defendant as to whether a *nolo contendere* plea will be entered. It was also implied that acceptance of the *nolo* plea before the second trial advanced · the public interest in speedy enforcement and involving a saving to the public fisc, objectives underlying the proviso clause. The Court also stated:

"The resulting problem is not happily resolved merely by conjuring with the words 'before any testimony.' It is relevant, though not in itself decisive, that for a variety of purposes, when a new trial is ordered, 'the case is tried as if it had not been tried before.' Barnsdall Refining Corporation v. Birnamwood Oil Co., 32 F.Supp. 308, 311 (E.D.Wis.1940). What tips the balance ultimately is that treating the new trial in this way achieves a result that seems to harmonize with the purpose of the section 5(a) proviso. Westinghouse not only capitulated at the outset of the new trial; it had attempted to do so before the first trial. It did not play the waiting game against which Congress guarded when it limited the proviso to consent judgments entered 'before any testimony.' It gave in full substance the consideration demanded by the proviso." 252 F.Supp. at 942.

In the present case, International did not give "in full substance the consider-

ation demanded by the proviso." The result in *Dalweld* is perhaps well justified in view of defendant's earlier attempt to capitulate before any evidence was taken in the first trial. International, on the contrary, put the Government to its proof. Of course, no criticism can be directed to any defendant which exercises its right to force the Government to prove its case. But at the same time it cannot thereafter insist that it should also be shielded from the prima facie effect of § 5(a). It is true that a consent decree before a second trial saves the public a double expense, which is one reason for accepting the *Barnsdall* decision. Yet that case fails to recognize that defendant is given a double advantage, while private litigants receive no benefit if a consent decree entered after a first trial is held to be within the proviso clause. Holding that a guilty plea is not covered by the consent decree proviso, the Court in Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 323 F.2d 412, 416 (7th Cir. 1963), cert. denied, 376 U.S. 939, 84 S.Ct. 794, 11 L. Ed.2d 659 (1964) stated:

"Congress did not intend to confer a benefit in the body of § 5(a), indicating a primary purpose, and, through the proviso, allow its frustration by the unilateral act of an antitrust violator." [10]

Agreeing that the prima facie rule is the dominant purpose of § 5(a), this Court is of the opinion that the result reached herein furthers that congressional policy.

B. *Scope of Estoppel—*

 Section 5(a) states that a Government decree shall be prima facie evidence as to all matters respecting which the decree would constitute an estoppel as between the United States and the Government defendants. Even

10. In accord: General Electric Co. v. City of San Antonio, 334 F.2d 480 (5th Cir. 1964); City of Burbank v. General Electric Co., 329 F.2d 825 (9th Cir. 1964). A Comment in 39 N.Y.U.L.Rev. 518 (1964) discusses a proposal to amend the Clayton Act to ensure that guilty pleas will be given prima facie effect. See also, Matteoni, Antitrust Ambiguity Under Section 5(a) of the Clayton Act, 11 U.C.L.A. L.Rev. 792 (1964).

though the statute uses the term estoppel without qualification, it is apparent, first, that the decree does not conclusively estop a Government defendant, and, secondly, that by the term estoppel Congress was referring to collateral estoppel, rather than res judicata. As § 5(a) worked its way through the legislative process, the House proposal that the Government judgment be conclusive against a government defendant was rejected in favor of the prima facie rule. See Twin Ports Oil Co. v. Pure Oil Co., supra, 26 F.Supp. at 374. Although some commentators have advocated amending the statute to make the decree conclusive,[11] as it now stands when a Government decree is introduced in a subsequent private action it only means that, standing alone, that decree will be sufficient to sustain a judgment on the issues for which it is submitted. But once the defendant comes forward with countervailing evidence to rebut the prima facie effect of the decree, the case proceeds much the same as if it had never been introduced. The decree does not relieve the plaintiff of satisfying the burden of persuasion, but simply requires that defendant carry forward the burden of producing evidence. Once defendant has produced that evidence, it is unlikely that a treble damage plaintiff will be content to rest upon the decree to satisfy his burden of proof.[12]

The estoppel language of § 5(a) is restricted, not only by the prima facie phrase itself, but also because that prima facie effect can extend just to matters actually litigated and determined in the prior Government action. As was stated in Emich Motors Corporation v. General Motors Corporation, 340 U.S. 558, 568–569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1952):

> "The evidentiary use which may be made under § 5 of the prior conviction of respondents is thus to be determined by reference to the general doctrine of estoppel. * * * Such estoppel extends only to questions 'distinctly put in issue and directly determined' * * *."

The Supreme Court has therefore made it clear that § 5(a) is guided by the principles of collateral estoppel, rather than the more stringent doctrine of res judicata. Under the latter, the estoppel effect reaches beyond those matters which were directly determined, and precludes relitigation of all matters that might have been raised and determined in the previous suit.[13] Thus res judicata has been called "claim preclusion" because it acts as a bar to an entire cause of action which has been previously litigated, while collateral estoppel has been labeled "issue preclusion" because it operates only on specific matters actually litigated.[14] Another distinction between the two doctrines is that collateral estoppel does not require mutuality

11. Comment, 39 N.Y.U.L.Rev. 518 (1964); Comment, 61 Yale L.J. 417, 425 (1952).

12. The Supreme Court has suggested that the prima facie rule of § 5(a) may often be a benefit of limited practical value. Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 319, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). This view is also advanced in 61 Yale L.J. 417, 425 (1962).
"[P]rior judgments and decrees are only prima facie evidence of issues previously determined and can be overcome by contrary evidence introduced by the defendant. Thus in practice, a treble damage plaintiff cannot rely on Section 5 but must relitigate much of the government's case."

See also, Note, 65 Harv.L.Rev. 1400, 1407 (1952).

13. Lawlor v. National Screen Service Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); Englehardt v. Bell & Howell Co., 327 F.2d 30, 32 (8th Cir. 1964). See generally, Note, Developments in the Law—Res Judicata, 65 Harv.L.Rev. 818 (1952); Scott, Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1 (1942).

14. Vestal, The Constitution and Preclusion/Res Judicata, 62 Mich.L.Rev. 33. Because collateral estoppel is a branch or subdivision of the general doctrine of res judicata the author adopts these terms to avoid confusion.

of parties. Thus collateral estoppel may be invoked to prevent a defendant from litigating an issue previously determined, even though the plaintiff in the second suit is not the same as in the first action.[15] Section 5(a) itself ignores mutuality to the extent that it allows the private plaintiff to make use of a judgment obtained by the Government in a suit to which it was not a party.

With this background, Emich Motors Corp. v. General Motors Corp., supra, may now be considered. That was a treble damage action by a former Chevrolet dealer corporation and its related finance company against General Motors Corporation and its subsidiary finance company, GMAC. The private action was based on a prior Government criminal suit in which defendants were convicted of violating the anti-trust laws by conspiring to restrain trade in General Motors cars. The indictment charged defendants with some twenty-six acts in furtherance of the conspiracy, including cancellation of franchises of dealers who refused to finance cars through GMAC. Plaintiff Emich Motors alleged that its franchises were terminated as a result of the conspiracy and in the treble damage action sought to introduce the entire record of the criminal case as prima facie evidence of this fact. The Supreme Court was called upon to define the scope of the matters directly determined by the Government action for purposes of the prima facie rule of § 5(a). Among the alternatives considered by the Court were that the Government judgment (1) was prima facie evidence that plaintiff's franchise was cancelled pursuant to the conspiracy found unlawful by the judgment; or (2) was prima facie evidence of the existence of the conspiracy, and while not prima facie specifically of the cancellation of plaintiff's franchise, was also prima facie evidence of such acts in

the performance of the conspiracy as the jury must necessarily have found in reaching a verdict of guilty; or (3) was prima facie only of the illegal conspiracy; or (4) had no prima facie effect at all because of the impossibility of determining on which of the twenty-six acts alleged in the indictment the jury based its verdict.

In the trial court plaintiffs offered in evidence the entire record of the testimony and exhibits from the Government case, but they were excluded. However, the trial court judge allowed the indictment, verdict and judgment to be presented to the jury as prima facie evidence of the conspiracy and also of the cancellation of plaintiffs' franchise. Overturning the verdict in plaintiffs' favor, the appellate court ruled the judgment was prima facie evidence of the conspiracy only. The Supreme Court reversed, and held that the judgment was prima facie, not only of the existence of a conspiracy, but also of its effectuation by coercive conduct against dealers.

"We are, therefore, of opinion that the criminal judgment was prima facie evidence of the general conspiracy for the purpose of monopolizing the financing of General Motors cars, and also of its effectuation by coercing General Motors dealers to use GMAC. To establish their prima facie case it therefore was necessary for petitioners only to introduce, in addition to the criminal judgment, evidence of the impact of the conspiracy on them, such as the cancellation of their franchises and the purpose of General Motors in cancelling them, and evidence of any resulting damages." 340 U.S. at 570–571, 71 S.Ct. at 415.

Thus the Court concluded that the jury's verdict determined a specific purpose of the conspiracy, i. e., to monopolize financing, and the means by which the

---

15. United States v. United Air Lines, 216 F.Supp. 709 (D.Wash.; D.Nev.1962), aff'd on this issue sub nom United Air Lines Inc., v. Wiener, 335 F.2d 379, 404 (9th Cir.), cert. dismissed, United Air Lines v. United States, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); United Banana Co. v. United Fruit Co., 172 F.Supp. 580 (D.Conn.1959). See also, Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan. L.Rev. 281 (1957).

purpose was carried out, i. e., coercion of dealers. While the Court did not go so far as to hold that cancellation of plaintiffs' franchises was part of the general coercion, at least plaintiff Emich could rely on the Government case to show the general operation of the conspiracy. Plaintiffs' proof, for a prima facie case, was thus limited to showing that the coercion reached them, through cancellation of the franchises, and the damages sustained.

Noting the difficulties involved in determining the matters adjudicated in a prior Government action where there is only a general verdict without special findings, the Court indicated in *Emich* that this is a question of law for the trial judge in the private action, to be determined "upon an examination of the record, including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts." 340 U.S. at 569, 71 S.Ct. at 414. In the present cases that task is made less difficult by the fact that the Government action was submitted to the Court alone, which formulated Findings of Fact, as well as a Memorandum Decision. Viewing these in light of the complaint, and the judgment subsequently entered, the matters determined by United States v. Morton Salt [16] are these: That Morton, Diamond, and International conspired, with others, to fix the prices of de-icing rock salt sold under sealed bids by Morton and International from 1956 through 1960 and by Diamond from 1957 through 1960 to governmental agencies located in the States of Minnesota, Michigan, Wisconsin, Illinois, Ohio and Indiana.

1. *Existence of Conspiracy*—In Paragraph 16, the Government's complaint charged defendants Morton, Diamond, International and Carey with engaging in an "unlawful combination and conspiracy to establish, maintain, stabilize and fix the prices of rock salt, in unreasonable restraint of * * * trade and com-

merce." In Finding IV the Court ruled that:

"Defendants, with co-conspirators, in concert, adopted a policy of restrictive pricing of rock salt to the end that bidding on this commodity to be furnished to the various governmental agencies with which the conspirators did business should produce identical prices."

Again, in Finding IX, the Court referred to the existence of an illegal conspiracy in stating that:

"Plaintiff has sustained its burden of proof not only by evidence of consciously parallel behavior but also by abundant positive evidence of outright collaboration establishing the existence of agreement and understanding among the parties."

Several references in the Memorandum Decision, together with these findings, establish without a doubt that the Court directly determined the existence of an illegal conspiracy between Morton and Diamond, and other coconspirators.

While International is not specifically mentioned in the two findings quoted above, and although it was not a party to the judgment entered on those findings, it is still possible to ascertain that International was found to be a participant in the illegal conspiracy. Since this Court has concluded that International's consent decree does not meet the requirements of the exclusionary clause of § 5(a), reference may be made to that decree, in conjunction with the complaint, to determine what was adjudicated. In addition, the Findings and Memorandum Decision with respect to Morton and Diamond are also available for consideration since they are a product of the record in the criminal case, in which International participated. As indicated, the complaint charged International with conspiring together with Morton and Diamond and others to fix the prices of rock salt. International's decree enjoins it from, among other things, establishing, maintaining, stabil-

16. United States v. Morton Salt Co., 216 F.Supp. 250 (D.Minn.1964.)

izing or fixing prices or pricing methods. Construed in light of the complaint, the decree thus determines that International engaged in the unlawful conspiracy. The Findings and Decision with respect to Morton and Diamond buttress this conclusion. That International's participation in the conspiracy was distinctly put in issue in the trial of the criminal case is suggested by the Court's Memorandum Decision in which the Court reviewed the evidence submitted with respect to International. In addition, Finding II refers to the location of International's salt mine; Finding III states that International shared with Morton and Diamond 85–90% of the rock salt market in the relevant geographic area. Taking all these factors into account, it must be concluded that the decree adjudicates International's participation in the illegal conspiracy.

A word of clarification should perhaps be said about the other defendants in these cases. Some plaintiffs have argued that the decree determines that Cargill and Cutler-Magner, as well as other defendants here, were participants in the conspiracy, or at least has probative value of this fact. In support of this contention, they look to Finding I which relates to sales by Morton and Diamond "and by other co-conspirators." In addition, the Amended Final Judgment states that it is applicable to Morton and Diamond, "and to all other persons in active concert or participation with such defendants who shall have received actual notice" of the injunction. Reliance on the judgment is ill placed since the injunction can be broader than what was actually determined. While the Memorandum Decision reviews the evidence concerning some of the companies named as coconspirators in the Government suit, and although other coconspirators are referred to in the Findings, no determinations made in the Government case can have prima facie effect on them, at least in the absence of connecting evidence. Once plaintiffs have introduced evidence relating a particular defendant here to the conspiracy involved in the Government case, it may be that the decree will then be admissible. But this goes beyond the scope of the issues presented here and must await the course of future proceedings before it can be determined.

Unlike the general verdict in *Emich,* which the Supreme Court construed as determining undefined coercive conduct, the Government decree here specifically determines the manner in which the conspiracy was effectuated. Referring to Finding IV, the goal of the conspirators was to meet, but not beat, the price of a competitor. To further this goal, Findings V–VII establish that the conspirators used a system of formula pricing in which the same f. o. b. mine prices were selected in order to compute identical delivered prices, but that these f. o. b. prices were contrived, including the use of artificial freight rates. Additionally, these Findings determine that the conspiracy was developed and maintained through periodic calls and meetings by and between the conspirators. Finding VIII establishes that the conspirators fulfilled their goal by the submission of virtually identical bids to governmental agencies.

■■ 2. *Product*—The Government's complaint alleged that rock salt is purchased by State and municipal agencies, on a bid basis, primarily for de-icing purposes, and by private purchasers for use in meat packing, water softening and salting of livestock, among other things. Upon trial, the only issues litigated were those with respect to de-icing rock salt sold to governmental entities, and Finding I limits all other findings to that product. While most of plaintiffs have confined their claims to de-icing rock salt, the Michigan complaint does refer to livestock salt. The decree does not cover this product for purposes of § 5(a), so the prima facie rule is limited to de-icing rock salt. In addition, the product area is further limited to sales under sealed bids. Some plaintiffs have argued that the price of rock salt sold on a competitive, non-bid basis was necessarily affected by the sealed bid

prices which were infected by the conspiracy, and thus the decree should also have estoppel effect with respect to these sales. This is not consistent with what was actually litigated and determined. The Court's Memorandum Decision explicitly states that "the issues herein are limited to sales to public authorities under *sealed bids*." (Emphasis supplied.) Therefore, the prima facie effect must be so limited. Needless to say, this does not prevent any plaintiff from presenting independent evidence of the effect which sealed bid prices had on rock salt purchased by any other method.

■■■ 3. *Time Period*—In Finding I, the Court explicitly sets out the time period involved as being 1956 to 1960 for Morton and 1957 to 1960 for Diamond. As suggested above, International is also included in the 1956 to 1960 period in view of references in the Memorandum Decision to evidence concerning that defendant's prices and policies during those years. In general, plaintiffs do not dispute that this is the relevant time period. However, it is argued that Diamond may be estopped by the decree as early as 1956 on the theory that a late entrant to a conspiracy is liable for all acts done by coconspirators prior to the latecomer's active participation. While this theory may have some significance on the question of damages, it does not permit this Court to go beyond the boundaries of what was actually determined in the Government suit for purposes of § 5(a)'s prima facie rule. A small problem has also arisen

with respect to the year 1960. The Findings refer to the years 1956 *to* 1960, which could be interpreted to mean that the cutoff date is December 31, 1959. The evidence presented, however, went into the year 1960, as indicated by the summary contained in the Memorandum Decision. Reading the Findings in light of the Court's opinion, the time period for estoppel purposes extends throughout the year 1960. Some suggestion has been made that the decree can have probative value for years before and beyond 1956 and 1960, or even that the decree should be given prima facie effect to prior or subsequent years. The Court is not here concerned with the use of the decree apart from § 5(a), and the authorities seem to agree that the prima facie effect must be confined to the period actually involved in the Government suit.[17] In Theatre Enterprises v. Paramount Film Distributing Corp., 201 F.2d 306 (4th Cir. 1953), aff'd, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), the treble damage plaintiff focused on a period subsequent to the Government decree. Resolving doubts about admissibility in plaintiff's favor, the trial court admitted the decree. However, the Court's instructions required plaintiff to prove by independent evidence the existence of a conspiracy in the area and during the period for which damages were claimed.[18] The decree was thus admitted for the purpose of relating the actions of which plaintiff complained to those involved in the Government suit. Seeking review of an adverse jury verdict,

17. See authorities cited in International Shoe Machine Corp. v. United Shoe Machinery Corp.. 315 F.2d 449, 455–456 (1st Cir. 1963).

18. The Court instructed the jury concerning the scope of the matters determined in the prior Government suit, and then added:
"Thus, these proven facts, I instruct you, become prima facie evidence in the present case, which the plaintiff may use in support of its claim that what the defendants have done since those decrees, in the present case in Baltimore, is within the prohibition of those earlier

decrees. However, this is only prima facie evidence. There was not before the Court in the prior case the present factual situation which is before you now with respect to Baltimore theatres. Therefore, it is still necessary in the present case, in order for the plaintiff to recover, for it to prove to your satisfaction by the weight of the credible evidence, that these defendants, or some of them, have conspired in an unreasonable manner to keep first run exhibitions from the plaintiff, or have conspired to restrict plaintiff to clearances which are unreasonable."
201 F.2d at 315.

plaintiff argued before the Supreme Court that the lower court erred in refusing to direct a verdict, and erred in not giving the degree broader prima facie effect. With respect to the latter contention, the Court said:

"We cannot agree. The trial judge instructed, in effect, that the *Paramount* decrees alone could not support a recovery by petitioner; additional evidence was required to relate the presumed *Paramount* conspiracy to Baltimore and to the claimed damage period. The reasons for this are clear. The *Paramount* decrees did not rest on findings, nor were the findings based on evidence, of a particular conspiracy concerning restrictions on runs and clearances in Baltimore theatres; yet such a conspiracy is the nub of plaintiff's claim. The *Paramount* case involved a conspiracy found to exist as of 1945, which was enjoined no later than June 25, 1948; but the conspiracy alleged here involves a claimed damage period running from February 1949 to March 1950. Indeed, the relevancy of *Paramount* to the instant case is slight." 346 U.S. at 543–544, 74 S.Ct. at 261.

While the Court did not pass upon defendant's contention that the decree should not have been given any prima facie effect, the opinion contains language suggesting that the prima facie use of a prior Government decree must be limited to the time period of that proceeding. Responding to plaintiff's argument that the actions of which he complained could be measured against the conduct found illegal in the prior Government suit, the Court said "the Paramount decrees, even if admissible, were only prima facie evidence of a conspiracy covering the area and existing during the period there involved." 346 U.S. at 541, 74 S.Ct. at 260. International Shoe Machine Corporation v. United Shoe Machinery Corporation, 315 F.2d 449 (1st Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963), suggests the same. Discussing the relationship which a private claim must have

to a Government suit to justify admission of the decree, the Court stated:

"If the identical anti-competitive practices proscribed by the Government proceedings occurred during the same time period as that involved in the subsequent private action, there is little question that the estoppel requirements of Section 5 would be satisfied since the subject matter of the private suit would be regarded as but a contemporaneous manifestation of the activities condemned in the Government case. It would appear that this is the classical situation contemplated by Section 5. In such a case, with the estoppel requirements of Section 5 satisfied, relevancy could be assumed. However, *if the pertinent practices involved in the Government case were adjudicated against the background of a time period different from that involved in the subsequent private proceeding, then, under traditional principles, Section 5's estoppel requirements seemingly would not be satisfied* and a relevancy question would not arise." 315 F.2d at 455. (Emphasis added.)

In accordance with these authorities, the prima facie effect must be limited to the years at issue in the Government suit. However, plaintiffs have also urged admission of a Government decree as background evidence to provide a contextual setting for claims outside the period of the decree. The *International Shoe* case, supra, rejected this argument pointing to the prejudicial effect the decree could have. Gottesman v. General Motors Corp., 221 F.Supp. 488 (D.N.Y.1963), cert. denied, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964), intimated a decree may be admissible for this purpose, particularly if the trial is to the Court. At present, this Court is not called upon to choose between the two approaches. Suffice to state that for prima facie purposes, the decree will be limited to the years above noted.

 4. *Geographic Area*—In Paragraph 19(b) of its complaint, the Government alleged that the conspiracy charged

resulted "in identical bids for the award of contracts covering the rock salt requirements of state and municipal Governments throughout most of the states in the United States." The evidence presented, however, did not deal with most of the States. In accordance with directions of the trial judge, the Government compiled a list of public authorities for which it would submit evidence in the criminal case. Upon trial, proof was adduced with respect to seventeen of the nineteen agencies on the list. In addition, some testimony came out concerning agencies in other areas, but upon motion of defendants, this testimony was stricken. Thus the evidence presented in the criminal case revolved around seventeen agencies. On this record the civil case was decided. In Finding I the Court named the agencies with which the Government's proof was concerned, excluding the City of Baltimore.[19] The other sixteen are all situated in six midwestern States, which are expressly designated in the Memorandum Decision: "The governmental agencies concerned are located in the States of Minnesota, Wisconsin, Michigan, Illinois, Ohio and Indiana." Again, in Finding III these States are enumerated and in Finding II the Court refers to a "Six-State Midwest Area."

Despite these indications that the relevant geographic area is limited to six States, the instant plaintiffs maintain that a general conspiracy was involved, pointing to Finding VIII which refers to the sixteen agencies "as indicative of bids made by the conspirators to public authorities generally." While this statement may be somewhat ambiguous, as plaintiffs contend, a logical interpretation is that the sixteen were indicative of bids to public authorities only in the six State area of which they are a part. The existence of a nationwide conspiracy may perhaps be inferred from evidence with respect to several different areas of the country, but here the proof was

concentrated in one particular area and this Court is not at liberty to enlarge upon that by drawing inferences inconsistent with what the trial court directly determined. Eagle Lion Studios v. Loew's Inc., 248 F.2d 438 (2d Cir. 1957), aff'd per curiam, 358 U.S. 100, 79 S.Ct. 218, 3 L.Ed.2d 147 (1958). In light of the Findings and Memorandum Decision, it must be concluded that the conspiracy litigated and adjudicated illegal by the Government decree must be confined to the six States noted above for purposes of § 5(a).

A distinction should be made between the States of Minnesota, Wisconsin, Michigan, Illinois, Ohio, and Indiana as geographic areas and these same States as purchasers of rock salt, and as plaintiffs in these treble damage actions. The use which they make of the decree as plaintiffs will be considered immediately, but in the present context it should be emphasized that they define the outer limits of the geographic area with which the Government case was concerned.

*C. Plaintiffs Benefited by § 5(a)—*

 As indicated, the Government's proof was limited to purchases by certain designated agencies. Defendants, relying on Finding I, contend that the prima facie benefit of § 5(a) can extend only to these purchasers. This particular Finding, inserted at the request of the Government defendants, purports to limit the succeeding Findings to sales of deicing rock salt by defendants to sixteen named agencies: State of Minnesota, City of Minneapolis, City of St. Paul, State of Wisconsin, City of Milwaukee, State of Illinois, Illinois Toll Road, City of Chicago, Chicago Transit Authority, State of Indiana, Indiana Toll Road, State of Michigan, Wayne County, City of Detroit, State of Ohio, and Ohio Turnpike. Plaintiffs rely upon Finding VIII to support their argument that the Government decree is not confined to the

---

19. No explanation was given for excluding the City of Baltimore from the scope of the Findings. Defendants suggest this was done to restrict the area to the Six Midwestern States in which the other purchasing agencies are located.

72

named sixteen, but rather extends to all public agencies in general. Since this Finding will be important in a related context, it should perhaps be quoted in full:

> "The effect of the conspiracy on public authorities was to cause bids to said public authorities for de-icing salt, including the sixteen mentioned specifically in the Government's proofs as indicative of bids made by the conspirators to public authorities generally, to be identical to a substantial and in many instances to an extraordinary degree, thereby depriving said public authorities of the advantage of competitive bidding."

Even though the Government suit may have focused on sixteen identified entities, § 5(a) does not preclude use of the decree by other private plaintiffs. Rather, that section states that a Government decree shall be prima facie evidence "in any action or proceeding brought by *any other party* * * *." The underscored phrase would seem to authorize use of a Government decree regardless of whether the private plaintiff was specifically mentioned in the Government case. Webster Rosewood Corporation v. Schine Chain Theatres, Inc., supra, dealt with an analogous situation. The Government decree sought to be admitted in that case determined that defendant theatres had monopolized first showings of motion pictures in Rochester, New York, even though other independent theatres had superior facilities. Defendant sought to prevent use of the decree on the ground that the Government findings did not specifically relate to plaintiff's theatre in Rochester. Refusing to construe § 5(a) so narrowly, the Court stated:

> "It seems impossible in the massive cases brought by the government to curb monopoly to itemize every business entity that did suffer from such unlawful monopoly. If such particularization were necessary for the provisions of Section 5 to operate, then the benefits intended by that Section would be definitely curtailed by such

reasoning. However, the better reasoning seems clear that such decrees are allowed as prima facie evidence of a general conspiracy with the necessary relation shown to the local area and the particular business interest alleged to be harmed by the impact of the broad, unlawful monopoly." 157 F.Supp. at 255.

On this analysis § 5(a)'s prima facie rule is not limited to the named sixteen. But since the relationship which each plaintiff's claim bears to the Government case is different, the extent of the prima facie benefit will not be identical in each of these cases.

 (1) *Plaintiffs Included in Finding I*—To prove his treble damage case, the private plaintiff must demonstrate defendant's violation of the antitrust laws; the injurious impact of the violation upon him; and the extent of any damages caused thereby. Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709, 727 (9th Cir. 1959), cert. denied, 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960). In some instances a prior Government judgment may be prima facie for all these elements, except the extent of damages. This is the stiuation of the sixteen agencies specifically identified in Finding I. For them the Government decree is prima facie with respect to the existence of a conspiracy for the product and in the years indicated above, effectuated by submission of almost identical bids. In addition, § 5(a)'s prima facie rule extends to the injurious impact which this conduct had on the sixteen governmental purchasers. This is so because the Government's evidence focused directly upon them. In Finding VIII the Court expressly determined that public authorities were deprived of the advantages of competitive bidding, which must extend, at the very least, to the named sixteen. The express determinations made here can be contrasted with the general verdict involved in *Emich*. It will be remembered that the Supreme Court interpreted the guilty verdict to determine both the existence of a general

conspiracy and its effectuation through coercing dealers to use GMAC financing. But even though the *Emich* plaintiffs gave testimony in the Government action, the general verdict did not necessarily determine that they had been coerced pursuant to the conspiracy. Thus they had to show impact, i. e., cancellation of their franchises, and the resultant damages. On the other hand, the decree here is based on findings that the conspiracy resulted in submission of almost identical bids to the named sixteen, and that they were thereby deprived of the advantage of competitive bidding. Therefore, to establish a prima facie case they need only show the extent of their damages, in addition to the Government decree. The prima facie effect covers all purchases of de-icing rock salt in the relevant years, even if a particular purchase was not included in the Government's evidence. This conclusion is a result of the fact that the quantity of the evidence adduced is often restricted by the trial judge to expedite the proceedings. Here much of the evidence relating to identity of bids was submitted in documentary form and it may well be that every purchase by the named sixteen within the relevant time period was included. With respect to defendants from whom the salt was purchased during these years, it is urged that the prima facie rule is applicable even though the purchase was from a non-Government defendant, or a consenting defendant such as Carey. However, the prima facie effect will have to be limited to Morton, Diamond, and International in order to conform to the conclusion reached above that § 5(a) has no application to any of the non-Government defendants here or to Carey. It may be that once it is demonstrated by independent evidence that these defendants were part of the conspiracy, the decree can have some evidentiary value with respect to them, but that cannot be ruled upon at present.

■ (2) *Plaintiffs Within the Six State Geographic Area*—All the plaintiff States in these cases—except Iowa and Missouri—are within the geographic area covered by the Government action, as well as within the named sixteen. However, some of them are suing on behalf of local governmental units within their boundaries, and some local authorities are plaintiffs in their own right. The situation of Missouri and Iowa is discussed in the succeeding subsection, so the concern here is with those public authorities who are not among the sixteen purchasers designated in Finding I, located within the States of Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin. Plaintiffs in this group can receive prima facie benefit from the Government decree to the extent of the existence of a conspiracy in the Six State Area of which they are a part. Beyond this, there are two major alternatives. The first stems from the fact that Finding I purports to limit all other Findings to sixteen designated agencies. If Finding VIII must be so limited, then these plaintiffs would be required to demonstrate by independent evidence that the statewide conspiracy had its counterpart on the local level, and had a particular impact upon them, which is analogous to the manner in which the *Paramount* decrees were handled. The Government proceedings there found a nationwide conspiracy, without particularization of localities in which the conspiracy existed. See Twentieth Century Fox Film Corporation v. Brookside Theatre Corporation, 194 F.2d 846 (8th Cir.), cert. denied, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952). Discussing this type of situation in a hypothetical example, the Court in Sun Theatre v. RKO Radio Pictures, Inc., 213 F.2d 284 (7th Cir. 1954) indicated that where a Government decree shows the existence of a nationwide conspiracy, it has no prima facie effect with respect to a local area. However, the *Paramount* decrees were admitted in private actions to show the relationship of a local conspiracy to the national conspiracy, provided the private plaintiffs showed by independent evidence concerted action in the local area and its impact upon them. See Loew's Inc. v. Cinema Amusements; Sablosky v.

Paramount Film Distributing Corp.; Webster Rosewood Corporation v. Schine Chain Theatres, Inc., supra. Of course, defendants favor this approach. Plaintiffs, on the other hand, emphasize that Finding VIII refers to the bid evidence submitted with respect to the named sixteen "as indicative of bids made by the conspirators to public authorities generally." Under the broad approach urged by plaintiffs the indication in Finding VIII that the conspiracy deprived public authorities of the advantage of competitive bidding would be construed to determine the existence of local conspiracies within the Six State Area and that the statewide conspiracy had a detrimental impact on all local purchasing agencies. In other words, they advance a construction that would place all plaintiffs in the Six State Area in the same category as the named sixteen. This interpretation seems to me consistent both with the Court's Findings and with the purpose of § 5(a). The Court's statement in Finding VIII that the proof with respect to the sixteen named agencies was indicative of bids to public authorities generally, read in conjunction with other Findings outlining a Six State geographic area, must be taken to determine that the conspiracy existed in localities throughout these States and had an impact on them, as represented by the local areas included in the named sixteen. In part this conclusion is dictated by the realization that the Government's proof was limited to sixteen agencies primarily to conserve trial time. In addition, this Court is mindful of the suggestion in *Emich* that Congress intended to give private plaintiffs as large an advantage as the estoppel doctrine can afford. Moreover, it should be kept in mind that under § 5(a) we are considering only a prima facie rule. Thus defendants are not prohibited from showing that the conspiracy found to exist in the State of Minnesota, for example, did not have a local counterpart or an impact in, for instance, Northfield, Minnesota. Accordingly, the Government decree will be given prima facie effect as to the fact of conspiracy in localities within the Six State Area and its effectuation and impact upon these local purchasing agencies, to the same extent as indicated with respect to the named sixteen.

■ (3) *Plaintiffs Outside Six State Area*—Plaintiffs Missouri, Iowa, and certain municipalities in the States of Kansas, Virginia, and Tennessee share the misfortune of being outside the Six State Area with which the Government case was concerned. Since the Court did not pass upon the existence of a conspiracy in these areas, the plaintiffs just mentioned must prove independently of the decree the existence and operation of the conspiracy in their area and its impact upon them. Again, it is contended that Finding VIII establishes that public authorities in general were affected by the conspiracy. At the most, that finding can be stretched only to the six States expressly enumerated. Thus these plaintiffs cannot make a prima facie case simply by introducing the decree. See Theatre Enterprises v. Paramount Film Distributing Corp., supra. This is not to say that the decree may not ultimately be ·of some benefit to them. If, as plaintiffs allege, there is some connection between their situation and the conspiracy found illegal in the Government case, that decree may have such relevancy to their case as to warrant its admission. All that is decided here is that the decree is not, standing alone, prima facie evidence of the existence of a conspiracy or its impact in the States of Missouri, Iowa, Kansas, Virginia, and Tennessee, or the municipalities within these States. It should be emphasized that the use which these and other ¨plaintiffs may make of the decree under the general rules of evidence, apart from § 5(a), is not at issue here.[20] Likewise, the manner

20. In *Emich* the Court confined itself to use of the decree under § 5(a), but stated, "we do not intend to preclude its admission for such other purposes, apart from § 5, as the general law of evidence may permit." 340 U.S. at 571, n. 8, 71 S.Ct. 415.

in which the decree will be presented to the jury should be postponed until the parties and issues involved have been narrowed.[21]

In summary, the Court has determined, subject to any qualifications noted above:

1. That the Government decree has prima facie effect for defendants Morton, Diamond, and International.

2. That the decree does not have prima facie application with respect to defendant Carey, and all the non-Government defendants.

3. That the matters determined by Government decree are (a) that Morton, Diamond and International conspired with others to fix prices (b) of de-icing rock salt sold under sealed bids (c) by Morton and International from 1956 through 1960 and by Diamond from 1957 through 1960 to (d) governmental agencies located in the States of Minnesota, Michigan, Wisconsin, Illinois, Ohio, and Indiana.

4. That the Government decree is prima facie evidence for Minnesota, Michigan, Wisconsin, Illinois, Ohio, and Indiana, and agencies within these States, with respect to the existence of a conspiracy, its effectuation and impact upon them.

5. That the decree is not prima facie evidence with respect to the existence, effectuation or impact of the conspiracy in all other plaintiff States or municipalities.

It is so ordered.

## CERTIFICATION

The Court is of the opinion that the Order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of the litigation.

---

21. Some of these cases have been partially or completely settled, which has an effect on the presentation of the Government litigation to the jury because of the different status of the various parties.